**FILED & ENTERED**

**SEP 28 2022**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY bakchell  DEPUTY CLERK

**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re: | Case No. 2:11-bk-33861-RK |
| RITA GAIL FARRIS-ELLISON, | Chapter 7 |
| Debtor. | Adv. No. 2:12-ap-01830-RK |
| | Adv. No. 2:14-ap-01088-RK |
| 2:12-ap-01830-RK | **MEMORANDUM DECISION** |
| JAMES LEE CLARK, | |
| Plaintiff, | <u>Trial</u><br>Dates:    June 17, June 21, July 15,<br>September 8, and December 2, 2021 |
| vs. | |
| RITA GAIL FARRIS-ELLISON, | Trial conducted by videoconference on Zoom<br>for Government |
| Defendant. | |
| 2:14-ap-01088-RK | |
| JAMES LEE CLARK, | |
| Plaintiff, | |
| vs. | |
| RITA GAIL FARRIS-ELLISON, | |
| Defendant. | |

-1-

On June 21, 2012, Plaintiff James Lee Clark ("Clark") initiated this adversary proceeding by filing his complaint against Defendant Rita Gail Farris-Ellison ("Farris-Ellison"),[1] to determine that the debts owed by her to him are nondischargeable.[2]  The operative pleadings in this adversary proceeding are Clark's third amended complaint and Farris-Ellison's answer thereto.  Docket Nos. 271, 288 and 295, filed on December 29, 2016, February 15, 2017 and February 28, 2017.[3]

On December 30, 2013, Clark obtained a default judgment against Farris-Ellison in state court, which established that she owed a debt of $100,000 to him. Plaintiff's Exhibit 10, State Court Judgment.[4]  The court in this adversary proceeding granted Clark partial summary adjudication of facts deeming established the facts that the state court entered judgment determining that Farris-Ellison owed Clark the amount of $100,000.  Order on Plaintiff's Motions for Summary Judgment, Denying Summary Judgment and Granting Motions in Part to State Certain Material Facts Are Not Genuinely in Dispute and Are Treated as Established in This Case, Docket No. 182, filed and entered on Sept. 14, 2015.[5]  However, the court denied Clark's motion for summary judgment as the court determined that there were genuine issues of material

---

[1]  Defendant Farris-Ellison filed her bankruptcy petition in this bankruptcy case, stating that her name was Rita Gail Farris-Ellison, and that she had no other names.  Petition, Main Bankruptcy Case, Docket No. 1.  At trial, Farris-Ellison stated her name as Rita Farris-Ellison-Jenkins.  Trial Transcript, June 21, 2021, at 165-166 (Farris-Ellison Testimony).  For the sake of simplicity, the court will refer to Defendant Farris-Ellison as Farris-Ellison.

[2]  Clark filed a second adversary proceeding, No. 2:14-ap-01088-RK, which asserts the same claims as this adversary proceeding.  The second adversary proceeding is duplicative of this adversary proceeding because the allegations relate to the same transaction and occurrence relating to Farris-Ellison's use of Clark's funds relating to his refinancing loan.  Complaint, Docket No. 1, Adv. No. 2:14-ap-01088-RK.

[3]  As reflected in the third amended complaint, the only parties in this adversary proceeding are Clark as plaintiff and Farris-Ellison as defendant.  The only proper parties in an adversary proceeding involving debt dischargeability claims under 11 U.S.C. § 523(a) are the creditor as plaintiff and the debtor as defendant.  Clark has filed numerous other complaints naming other parties, which complaints are not properly before the court.

[4]  The court granted Clark relief from stay to prosecute his state court action against Farris-Ellison.  Bankruptcy Case No. 2:11-bk-33861-RK, Docket No. 86 (stay relief order filed and entered on June 19, 2013).

[5]  In its order granting summary adjudication of facts, the court states that the following facts are established: (1) Defendant Rita Farris-Ellison is indebted to Plaintiff James Clark in the amount of $100,000.00 based on the judgment of the Superior Court of California for the County of Los Angeles in the case of *James Lee Clark v. Rita Farris Ellison, et al.*, Case No. TC 023636, entered on December 30, 2013; (2) The Superior Court of California for the County of Los Angeles based its judgment on its factual finding that Plaintiff James Clark met his legal burden of proving that Defendant Rita Gail Farris-Ellison withheld and refused to return $100,000.00 that belonged to the Plaintiff."  *See also,* Plaintiff's Exhibit 10, State Court Judgment.

1  fact that precluded summary judgment as to whether Farris-Ellison had the requisite

2  intent to support Clark's nondischargeability claims under 11 U.S.C. § 523(a).

3       The court conducted a trial in this adversary proceeding on June 17, 2021, June

4  21, 2021, July 15, 2021, September 8, 2021, and December 2, 2021.  At the final day of

5  trial on December 2, 2021, the parties agreed that they would make their closing

6  arguments in writing.  Trial Transcript, December 2, 2021, at 77-78 (colloquy between

7  court and parties).  On December 3, 2021, the court issued a post-trial scheduling order

8  that the parties lodge proposed findings of fact and conclusions of law by April 6, 2022

9  and scheduled a post-trial status conference for March 1, 2022.  Docket No. 595.

10       At the post-trial status conference on March 1, 2022, counsel for Farris-Ellison

11  requested a short extension of the post-trial deadlines, and the court granted the

12  request and subsequently issued an order on March 8, 2022 amending the post-trial

13  scheduling order extending the deadline for the parties to lodge proposed findings of

14  fact and conclusions of law to April 15, 2022.  Docket No. 609.

15       On April 14, 2022, Clark lodged proposed findings of fact and conclusions of law.

16  Docket No. 612.  As reflected on the case docket, Farris-Ellison did not lodge any.

17  Clark also filed post-trial closing briefs on April 14 and 25, 2022.  Docket Nos. 611, 613

18  and 615. Also, as reflected on the case docket, Farris-Ellison did not file any.  Since

19  Farris-Ellison did not file a closing brief setting forth her closing argument as agreed, the

20  court now considers that she has waived closing argument since she has not filed any

21  written closing argument in a closing brief since the deadline for lodging proposed

22  findings of fact and conclusions of law passed on April 15, 2022 and the court is now

23  issuing its final decision herein on September 28, 2022.

24       <u>The Parties</u>

25       Clark is the owner of a trucking and construction business that is called J.C.

26  Bobcat Trucking, formerly known as Clark Trucking.  Trial Transcript, September 8,

27  2021, at 188 (Clark Testimony).  Clark's business was and is primarily trucking, but he

28  also supervises a construction work crew.  *Id*. at 189.  In 2008, Clark had nine people

1   working for him, and his construction crew included Melvin Sims, one of Clark's trial

2   witnesses. *Id.* at 188-189; Trial Transcript, June 21, 2021, at 15-28 (Sims Testimony).

3   Clark owned a residence located in the City of Los Angeles, California, and a

4   transaction in which he refinanced a loan on his residence with the assistance of Farris-

5   Ellison as his loan broker and escrow agent is the center of the controversy here.  *See*

6   Third Amended Complaint, ¶¶ 3-16, Docket No. 271 at 7-8 (internal page citation at 2-

7   3); Answer to Third Amended Complaint, Docket No. 295 (responses thereto, partially

8   admitting and partially denying allegations in paragraphs 3-16).

9       Farris-Ellison was a mortgage broker and real estate agent licensed by the State

10   of California.  Trial Transcript, June 21, 2021, at 170-171 (Farris-Ellison Testimony);

11   Trial Transcript, July 15, 2021, at 16-18, 36 (Farris-Ellison Testimony).  She was

12   licensed as a mortgage broker in 1993.  Trial Transcript, June 21, 2021, at 171 (Farris-

13   Ellison Testimony).  According to Farris-Ellison, a mortgage broker originates loans

14   mostly residential refinancing or purchase loans.  *Id.*

15       Farris-Ellison maintained her business office at 4700 Crenshaw Boulevard, Los

16   Angeles, California.  Trial Transcript, July 15, 2021 at 65-66.  Farris-Ellison organized

17   and owned two businesses, Lenders Escrow, Inc., and Just That EZ Financing, which

18   were originally formed in California, but reorganized as business entities in Nevada.  *Id.*

19   at 31-35, 64-67; Trial Transcript, June 21, 2021, at 167 (Farris-Ellison Testimony).

20   Farris-Ellison was performing broker escrow services under the unlicensed name of

21   Lenders Escrow, Inc., as determined by the California Department of Real Estate.

22   Plaintiff's Exhibit 14, Decision of California Department of Real Estate, filed August 29,

23   2012.  Lenders Escrow and Just That EZ Financing operated out of Farris-Ellison's

24   business office. Trial Transcript, July 15, 2021, at 64-67 (Farris-Ellison Testimony).

25       Farris-Ellison was the owner/operator of Lenders Escrow, and she had one

26   escrow officer named Genevieve Aldophus working for her.  Trial Transcript, July 15,

27   2021, at 66-67 (Farris-Ellison Testimony).  Lenders Escrow only had one business bank

28   account, a checking account, in which its business funds and client funds were

commingled; it had no separate client trust account to hold for escrow transactions.  *Id.*
at 67-71.  That is, Lenders Escrow paid its business expenses out of its one checking
account.  *Id.*  Lenders Escrow handled Clark's residential loan refinancing transaction in
2008.  *Id.* at 64-65.

Clark made a complaint about Farris-Ellison to the California Department of Real
Estate ("DRE") about her handling of his residential refinancing transaction, and in
2012, the DRE imposed discipline on Farris-Ellison, revoking her real estate broker's
license and placed restrictions on her real estate agent's license.  Trial Transcript, July
15, 2021, at 64-67 (Farris-Ellison Testimony); Plaintiff's Exhibit 14, Decision of
California Department of Real Estate, filed August 29, 2012.  Farris-Ellison still has a
restricted real estate agent's license, but is not active.  *Id.*

The Parties' Relationship

The parties sharply differ on the character of their relationship.  The parties have
known each other a long time.  Farris-Ellison testified that she has known Clark since
the 1990s, over 20 years.  Trial Transcript, June 21, 2021, at 167 (Farris-Ellison
Testimony); *see also* Trial Transcript, July 15, 2021, at 12 (Farris-Ellison Testimony).
Farris-Ellison testified that she met Clark through a mutual friend, Al Williams, who was
an electrician contractor like Clark, after she moved from Louisiana to California in
1969, and that they go to know each other because she is in the real estate business
and Clark is a construction contractor.  Trial Transcript, September 8, 2021, at 42
(Farris-Ellison Testimony).

According to Farris-Ellison, Clark was a friend as well as a client as they did work
together, and they were friends in 2008.  Trial Transcript, June 21, 2021, at 167 (Farris-
Ellison Testimony).  She testified that they "go way back because he's a contractor and
he's done some work at my house when I lived in Lynwood many years ago."  *Id.* at
168; Trial Transcript, July 15, 2021, at 88 (Farris-Ellison Testimony).  Farris-Ellison said
that when Clark did repairs on her house in Lynwood, it was many years before, and not
in 2008, and that she paid him for his work in cash, and not with a check from the

Lenders Escrow bank account. *Id.* Farris-Ellison admitted that Clark did construction repair work for her on her home as well as her rental properties. Trial Transcript, September 8, 2021, at 56-59 (Farris-Ellison Testimony). According to Farris-Ellison, Clark did this construction repair work for her not as a contractor, but as a "friend." "Sometimes when I had – I had rental properties and there was something wrong at the place for whatever reason, it might have been something minor, he would go and take care of it for me, and he wouldn't charge me as a contractor. He just would do it as a friend." *Id.* at 56. Asked how long Clark has done this work for her, Farris-Ellison answered, "Oh, over – we've been friends for over 20 years." *Id.* Then she clarified her answer: "Whenever I needed it. I don't know the specifics." *Id.* Asked "So if this was 2008, this may have been 18 or 19 years later that he did work for you," Farris-Ellison answered "yes." *Id* at 56-57. Farris-Ellison acknowledged that Clark did repairs on her duplex on 36th Street in Los Angeles. Trial Transcript, June 21, 2021, at 218 (Farris-Ellison Testimony).

Farris-Ellison testified that many years ago, she used to work for a bank, Family Savings Bank, when she first met Clark, and did a refinance or purchase loan for his current residence through the bank, and later did another loan for him in 2008. Trial Transcript, June 21, 2021, at 168 (Farris-Ellison Testimony).

According to Farris-Ellison, Clark visited her at her office daily or weekly. Trial Transcript, September 8, 2021, at 84-89 (Farris-Ellison Testimony); Trial Transcript, June 21, 2021, at 172 (Farris-Ellison Testimony). She testified that she and Clark socialized outside the office, and even went on trips together, just him and her, including a "turnaround" trip to Las Vegas, driving there and then driving back on the same day. *Id.* at 89-90. Farris-Ellison said that she and Clark drove four hours to Las Vegas, stopped for half an hour and then drove back, but did not recall what year that trip was, but recalled that it was before Clark's refinancing transaction in 2008. Trial Transcript, September 8, 2021, at 171-172 (Farris-Ellison Testimony).

Farris-Ellison testified that she has gone to Clark's mother's house and says she

knows his family.  *Id.* at 89, 93.  However, Farris-Ellison admitted that while she met

Clark's family, she did not have get-togethers with his family, saying "I didn't know them

like that."  *Id.* at 92-93.[6]

During the 2007-2008 time period, Farris-Ellison testified that she saw Clark

often:

> Well, I mean he used to come to the office all the time.  I mean he'd even
> bring us lunch.  He'd bring me wine.  You know, we'd go to the wineries
> and he did a lot of things.  He was always there, you know.  Sometimes I
> just say, "come and hang out," for whatever reason.  But he was pretty
> much there and then there was instances where we would have a break
> and maybe I don't see – he might get busy in his life or whatever he's
> doing.  I might not see him for months, sometimes a year, you know.  But
> then he comes back around and he's around.  But if he got busy, he didn't
> show up.  But during that period of time, he was around a lot during that
> period of time.

Trial Transcript, June 21, 2021, at 172-173 (Farris-Ellison Testimony).

Farris-Ellison in her testimony described Clark's demeanor in the 2007-2008 time

period:

> Q.      . . . how would you describe . . . Mr. Clark's sort of demeanor
> towards . . . you and your . . . employees, and was he generous, was he
> nice?  How would you describe Mr. Clark at that time?
>
> A.      He was very generous.  He was very generous and very nice and
> everybody liked him.  I mean he just was that jovial guy all the time.  You
> know, he came in and he – his presence was always funny.  You know,
> we was always having fun with him but he always came bearing gifts.  He
> always brought us something.  He just did.  He just did that.  He was that
> person and I – all the years I've known him, that's the kind of the way he's
> been.

---

[6] Farris-Ellison's testimony about knowing Clark's family was not consistent.  When her counsel asked her whether she would describe her relationship with Clark as a close relationship where someone like Clark would feel comfortable in lending or giving her whatever money she needed to stay afloat, she responded: "Yes. . . I mean obviously we were close.  I don't think he would just give it to anybody, but he also – I knew his wife.  I knew everybody.  I was always at his hour.  I seen him redo his home and do lots of things.  So I mean I witnessed – and I was in his presence in his home more often than not and he would come to my house and do repairs, I mean, you know, as a friend.  He repaired a couple of things for me just as a friend.  He did things like that.  So I think we've been friends for a long time.  Maybe I've been misled."  Trial Transcript, June 21, 2021, at 257 (Farris-Ellison Testimony).

1  *Id.* at 173-174.  According to Farris-Ellison, Clark even fried a Thanksgiving turkey for

2  her and dropped it off at her house for her family in 2008, the year of Clark's refinancing

3  transaction.  Trial Transcript, September 8, 2021, at 91-92 (Farris-Ellison Testimony).

4          Regarding their business relationship, Farris-Ellison testified that she referred

5  business to Clark, that is, "lots of people" to him to do home repairs. Trial Transcript,

6  June 21, 2021, at 169 (Farris-Ellison Testimony).  She testified that she knew a lot of

7  contractors, but she would consider the first one in line for her referrals.  *Id.; see also,*

8  Trial Transcript, September 8, 2021, at 91 (Farris-Ellison Testimony).  According to

9  Farris-Ellison, in describing Clark's workmanship, she said he was good at what he did,

10  was fast and efficient, and "[e]verybody I know he did work for, they were pleased."

11  Trial Transcript, June 21, 2021, at 170 (Farris-Ellison Testimony).

12          Farris-Ellison testified that she "did a lot of financial things with Mr. Clark," such

13  as his refinancing his property.  Trial Transcript, July 15, 2021, at 12-13 (Farris-Ellison

14  Testimony).  However, she testified that they "hadn't any exchanges of financial monies

15  between each other until" the first alleged loan made to her by Clark in August 2008.  *Id.*

16  at 12-13.  Farris Ellison also admitted that she was not aware of his financial situation

17  other than he needed to take out the existing hard money loan.  Trial Transcript, June

18  21, 2021, at 170 (Farris-Ellison Testimony) ("I never got in his personal business to

19  know anything beyond what he told me.").

20          Clark admitted that he has known Farris-Ellison from 1990.  Trial Transcript,

21  September 8, 2021, at 229 (Clark Testimony). Clark confirmed that he and Farris-Ellison

22  first met through Al Williams, who introduced her to him.  *Id.* at 230.  About what Clark

23  knows about Farris-Ellison, he testified: "I just know off and on that she do loans. . . ."

24  *Id.*  About Clark's dealings with Farris-Ellison, he testified that previously he tried to get

25  a couple of loans through her, but they did not go through and he lost a couple of deals

26  in the process, and then started to use other people to do loans because he needed to

27  act fast on deals.  *Id.*  Clark in his testimony denied that he and Farris-Ellison were

28  friends.  Trial Transcript, June 21, 2021, at 87-88 (Clark Testimony) ("We didn't have no

friendship."). Clark denied that he socialized with Farris-Ellison, saying, "I don't socialize that much. If you ain't got time to give me a dollar, I ain't got time for you, because I'm going to be honest with you." Trial Transcript, September 8, 2021, at 232 (Clark Testimony). Clark also testified that whatever socializing he does is with his family and his family only socializes within their church, and Farris-Ellison is not part of his family's church. *Id.* at 232-233. Clark denied that he and Farris-Ellison went on a "turnaround" trip to Las Vegas and back. Trial Transcript, September 8, 2021, at 228-229 (Clark Testimony) ("That didn't happen."). Clark denied that he fried and gave Farris-Ellison a Thanksgiving turkey. Trial Transcript, September 8, 2021, at 202 (Clark Testimony) ("I didn't fry her no turkey.").

Clark denied that he frequently visited Farris-Ellison's business office and said that in 2008, he only visited her office one or two times, and not in 2007. *Id.* Clark denied that he brought Farris-Ellison and her office staff lunch. Trial Transcript, September 8, 2021, at 239 (Clark Testimony) ("No, I didn't bring no lunch. I ain't got time to get nobody no lunch.").

Clark worked on construction repair projects for Farris-Ellison, that is, he "worked on her buildings remodeling them." Trial Testimony, September 8, 2021, at 180 (Clark Testimony). Clark was working on construction repair projects for Farris-Ellison in 2008 and 2009, stating that he had worked on her projects through the end of 2008 when he went to Arizona to work, and then finished what work he had to do for her by February 2009. *Id.* at 177-178. The work Clark said that he was doing for Farris-Ellison at this time in 2008-2009 included putting windows, doors, cabinets and garage doors and some heavy hauling for her. *Id.* at 177. Clark's construction work for Farris-Ellison at this time was at four locations, including a rental property in Lynwood, a duplex on 36th Street in Los Angeles, Farris-Ellison's office on Crenshaw Boulevard and the apartment building on Vermont Avenue jointly owned with Farris-Ellison's daughter. *Id.* at 181-185. The Lynwood project was a kitchen remodel that Clark quoted Farris-Ellison a price of $20,000 and involved removal of cabinets, reinstalling drywall and putting in

windows. *Id*. at 182.  According to Clark, Farris-Ellison came to his house in June 2008 and told Clark that she had a job for him, which was the Lynwood kitchen remodel, and he told her that he had a need for a refinancing loan, which started the refinancing loan process, but he testified that he never went to her office for the loan. *Id*. at 182.  The Vermont Avenue project that Clark was doing for Farris-Ellison and her daughter involved paining, patching walls and fixing windows. *Id*. at 183-184.  According to Clark, Farris-Ellison told him that she needed construction work on her business office and her 36th Street duplex. *Id*. at 184.  According to Clark, he understood the payments made by Farris-Ellison to him during this time period were for the work that he was going for her on her buildings. *Id*. at 177-187.  Clark testified that he did not know that the funds being used by Farris-Ellison for these payments for his work were from his surplus refinancing proceeds. *Id*.  Clark admitted that he did not generally have written contracts for the work he did for Farris-Ellison, just "a couple of them I did."  Trial Transcript, September 8, 2021, at 221 (Clark Testimony).  Clark did not produce at trial any written contracts for the projects he did for Farris-Ellison.

<u>First Alleged Loan of $20,000 by Clark to Farris-Ellison in August 2008</u>

Farris-Ellison testified that Clark made her a loan of $20,000 in August 2008. Trial Transcript, July 15, 2021, at 10-13 (Farris-Ellison Testimony).  According to Farris-Ellison, the real estate market was getting slow at that time, and Clark said he could give her a loan because he could and did make a loan to her of this money. *Id*.

Farris-Ellison testified that in 2008, she was getting behind in her bills and needed money.  Trial Transcript, July 15, 2021, at 76 (Farris-Ellison Testimony).

The alleged loan is reflected in Check No. 1042 dated August 12, 2008 written on Clark's checking account payable to "Rita Ellison" signed by Clark. Trial Transcript, July 15, 2021, at 119 -121 (Farris-Ellison Testimony).  A copy of the check is part of Plaintiff's Exhibit 31, and Farris-Ellison identified the check at trial and said that she received and cashed it. *Id*.; Plaintiff's Exhibit 31, Checks.

Farris-Ellison testified that she did not recall whether she first solicited the loan

from Clark, but said she may have.  Trial Transcript, September 8, 2021, at 42 (Farris-Ellison Testimony).  She testified that the loan came up when Clark called her to offer a loan of $20,000.  *Id.* at 44; *see also,* Trial Transcript, July 15, 2021, at 120 (Farris-Ellison Testimony) ("Q.  So what was the purpose of your receiving this money, Ms. Ellison?  Was this a loan that was being made or what?  A.  Yes.  He [Clark] called me and said he could loan me that amount of money and I waited to take it out at the time (phonetic).  Q.  'He' meaning who?  A.  James Clark.  I'm sorry.  Mr. Clark.").

Also, according to Farris-Ellison, there were no loan terms other than repayment at some time.  Trial Transcript, July 15, 2021, at 120 (Farris-Ellison Testimony) ("Q. And were there any terms for the loan?  A.  No.  Q.  It was just whenever you could pay it back, right?  That's what this--  A.  Yes.").  There was no written loan agreement.  Trial Transcript, September 8, 2021, at 44-45 (Farris-Ellison Testimony).  Farris-Ellison was asked during trial why was she unable to repay this particular loan, and she answered: "It was never a discussion to be repaid.  It never came up."  Trial Transcript, June 21, 2021, at 182 (Farris-Ellison Testimony).

Farris-Ellison testified that the discussion she had with Clark about the loan was at his home when she went there to pick up the check.  Trial Transcript, July 15, 2021, at 120 (Farris-Ellison Testimony).  According to Farris-Ellison, she and Clark met in his front yard, and he handed her the check.  *Id.* at 121-123.

The check had a notation "Investment (loan)" on the memorandum line on the face page of the check, but Farris-Ellison did not know who wrote that notation because it was not her handwriting.  Trial Transcript, July 15, 2021, at 119-120 (Farris-Ellison Testimony); Plaintiff's Exhibit 31, Checks.

Farris-Ellison testified that she used the money to pay personal bills, though she did not recall the specifics.  Trial Transcript, July 15, 2021, at 119-120 (Farris-Ellison Testimony).   Farris-Ellison testified that she did not keep track of the use of the money lent to her because this loan was "personal."  Trial Transcript, June 21, 2021, at 208 (Farris-Ellison Testimony).

When asked how Clark knew about Farris-Ellison's financial problems, she testified:

> Mr. Clark was in my office on a daily basis watching everything going on, and matter of fact, he would bring his lunch in, and he would –he would sit in my office and do a lot of his own business.  He was a personal friend, so he was in my office doing a lot of his own things, so he saw where the – I guess the business was going down, and he just, you know, saw a need, so that's when he offered it [the loan] to me.

Trial Transcript, September 8, 2021, at 84-85 (Farris-Ellison Testimony).  According to Farris-Ellison, "[a]lmost every week he would be in my office," that is, "[h]e came by all the time."  *Id.*

Farris-Ellison in her testimony elaborated:

> Q. – what do you mean, all the time?  You mean daily or weekly?
>
> A.  Daily and weekly.  I mean, he would come daily – I never knew when he was going to show up.  He would just show up.  He just – he was there all the time.  And matter of fact, he would bring his lunch.  He would bring lunch to us and – spend time with us visiting.  And he'd come in, sit in my office, talk with me, talk with my staff.  That's something I did since I've been knowing him.
>
> Q. For 19 years?
>
> A.  Yes, sir, as long as I've been in this business.  Whenever I was working, he would –
>
> Q.  So he would –
>
> A.  – he would show up.

Trial Transcript, September 8, 2021, at 85 (Farris-Ellison Testimony).

Clark testified that the purpose of the $20,000 check was to address Clark's property tax problem.  Trial Transcript, September 8, 2021, at 222 (Clark Testimony).  According to Clark, "It was the check to make sure the taxes got taken care of, because the taxes needed to be taken care of, was having problems back and forth, and then they didn't want to get – they called me about the taxes a couple of times."  *Id.*  Clark

testified that the tax problem arose from "supplemental taxes because I put a huge

addition on my house," which was "over 2,500 square feet." *Id.*  Regarding Farris-

Ellison's denial that she was helping Clark with his tax problem, he testified: "No, that's

not correct, Your Honor.  She did the taxes.  She was supposed to pay the taxes current

after I got the loan.  When I got the loan, everything was supposed to be straightened

out.  Once the loan closes, I shouldn't have had a tax problem or anything.  All I should

have been doing is paying the note." *Id.* at 223.

Clark asked Farris-Ellison to help him with the property tax issue because she

was in the real estate business:

> Q.       . . . what was the purpose of the $20,000 again?
>
> A.       . . . if the problem came, that she can negotiate with the tax people
> because I was having a hard time dealing with them because they were
> like, "Well, this and this and this," and I didn't understand it.  And so I think
> because she's in the business, she got the loan, so she should be able to
> explain to the people what happened.

Trial Transcript, September 8, 2021, at 224 (Clark Testimony).  Clark explained his

agreement with Farris-Ellison about the use of the $20,00 check, that is: "To take care

of the problem, whatever it took.  I said, 'Money is not the'– she used that phrase.  I

said, 'Money's not the problem. Take care of the problem.'  I brought her $40,000.

Matter of fact, I brought her $60,000. . . ." *Id.*  Nevertheless, Clark testified the $20,000

was not a loan to Farris-Ellison.  *Id.*  According to Clark, "I don't make loans." *Id.* at 226.

As to Clark's knowledge of Farris-Ellison's financial problems, he denied that he

knew about them.  Trial Transcript, September 8, 2021, at 188 (Clark Testimony).  Clark

was asked about Farris-Ellison's testimony that she was having problems in her

business because the housing market was slowing down and that she said that he felt

concerned about her and worried about her because they were friends, Clark's

testimony in response was, "No, I'm not worried – I was not worried about her problems.

I have my own problems, and I am not going to spend my money on someone else's

problems when I have my own problem.  I got to keep my doors open and keep the

1    guys working.  That's it."  Trial Transcript, September 8, 2021, at 188 (Clark Testimony).

2       <u>Clark's Residential Loan Refinancing Transaction with Farris-Ellison as Broker</u>

3       <u>and Escrow Officer</u>

4       Early in the trial, Clark testified that the purpose of seeking a refinancing loan on

5 his residence was he was in the process of buying a piece of real property in Culver City

6 and went to Just That EZ Financing to get a loan to cover the rest of the purchase price.

7 Trial Transcript, June 21, 2021, at 31, 42, 81 (Clark Testimony).  That is, Clark was

8 taking out equity from his house to buy another piece of property.  *Id.* at 43.

9       According to Farris-Ellison, she understood that Clark's purpose in seeking the

10 refinancing loan not to get cash out of his equity in the house, but to pay off a hard

11 money loan that he took out which was secured by the house.  Trial Transcript,

12 September 8, 2021, at 82 (Farris-Ellison Testimony).  Clark admitted that he took out

13 the hard money loan to buy the property that he was trying to buy.  Trial Transcript,

14 June 21, 2021, at 83-85 (Clark Testimony).

15       Later, in the trial, Clark testified that the purpose of the refinancing loan was to

16 take out some equity "to make my family more comfortable," that is, Clark wanted to do

17 some home improvement because in June 2008, his mother became seriously ill, and

18 he wanted to make modifications to accommodate her handicap conditions.  Trial

19 Transcript, September 8, 2021, at 192 (Clark Testimony). Clark also denied that he

20 needed to get rid of the hard money loan because he had no problem paying his bills

21 and was interested in getting a lower interest rate "like everybody else."  *Id.*

22       According to Clark, Farris-Ellison was "in the neighborhood" and came by his

23 house and asked him if he needed a loan for her, and not that he approached her first

24 about getting a loan.  Trial Transcript, June 21, 2021, at 85-87 (Clark Testimony).  This

25 was in June 2008.  Trial Transcript, September 8, 2021, at 182-183 (Clark Testimony).

26 According to Clark, Farris-Ellison had come over to talk to him about a construction

27 project for one of her rental houses in Lynwood near the Compton border.  *Id*. Clark

28 quoted her a price of $20,000 for a kitchen remodel on that property.  *Id.*  During the

time period of 2008-2009, Clark was working for Farris-Ellison on three or four projects, including the Lynwood house, her business office, a property owned by Farris-Ellison's daughter and a property on 36th Street in Los Angeles.  *Id*. at 183-184.  Farris-Ellison denied that she had gone to his house to solicit him to apply for a loan, but testified that instead, it was Clark who came to her office to apply for a loan.  Trial Transcript, September 8, 2021, at 116-117 (Farris-Ellison Testimony);

Farris-Ellison assisted Clark with his residential refinancing loan in 2008.  Trial Transcript, June 21, 2021, at 168, 174 (Farris-Ellison Testimony); Trial Transcript, September 8, 2021, at 47-48 (Farris-Ellison Testimony).  According to Farris-Ellison, she and Clark first talked about a refinancing for him earlier in 2008, but he took out a hard money loan at that time.  Trial Transcript, June 21, 2021, at 174 (Farris-Ellison Testimony).  She testified that either at the end of August or the beginning of September 2008, they met and decided that he needed another refinancing loan to take out the hard money loan.  *Id.* at 178.

Farris-Ellison received a loan application from Clark.  Trial Transcript, September 8, 2021, at 101 (Farris-Ellison Testimony).  She submitted Clark's loan application to Flagstar Bank.  Trial Transcript, June 21, 2021, at 182 (Farris-Ellison Testimony); Trial Transcript, September 8, 2021, at 117, 120 (Farris-Ellison Testimony).  The lender for the refinancing loan was Flagstar Bank, and Farris-Ellison was the loan broker who facilitated the loan through her business, Just That EZ Financing. Trial Transcript, September 8, 2021, at 81-82 (Farris-Ellison Testimony).   During escrow, the funds for Clark's refinancing loan were deposited into and held in Lenders Escrow's one checking account and commingled with other funds held by Lenders Escrow.  Trial Transcript, July 15, 2021, at 69, 117-118 (Farris-Ellison Testimony); Trial Transcript, September 8, 2021, at 29-31 (Farris-Ellison Testimony).

Lenders Escrow prepared an Escrow Closing Statement on Form HUD-1, for Clark's loan refinancing transaction.  Plaintiff's Exhibit 19, Escrow Closing Letter and Form HUD-1; Trial Transcript, June 21, 2021, at 187 (Farris-Ellison Testimony). A cover

1  letter signed by Farris-Ellison's escrow officer, Genevieve Adolphus, dated October 21,

2  2008, accompanied the HUD-1.  *Id.*  According to Farris-Ellison, Adolphus sent out the

3  HUD-1 and her cover letter to Clark in accordance with her office's typical procedure,

4  though she is not definitely sure because it would have been Adolphus who prepared

5  and sent out the letter to Clark.  *Id.* at 187-188.

6          According to the Escrow Closing Statement, HUD-1, the amount of Clark's

7  refinancing loan from Flagstar was $300,000.  Trial Transcript, June 21, 2021, at 192-

8  193 (Farris-Ellison Testimony); Plaintiff's Exhibit 19.  After the payment of existing liens

9  and expenses, the amount to be disbursed to Clark as the borrower (i.e. item no. 303,

10  CASH TO BORROWER) was $50,845.07.  Plaintiff's Exhibit 19, HUD-1*; see also,*

11  Facepage of HUD-1, Defendant's Exhibit 2.  The HUD-1 reflects the settlement of all

12  charges against the escrow and payments that would be made from escrow.  Trial

13  Transcript, June 21, 2021, at 192-205 (Farris-Ellison Testimony).  The HUD-1 reflected

14  a charge of $1,784.72 for Los Angeles County property taxes for the first half of the tax

15  year, which amount is determined by the lender.  *Id.* at 199-200.  The HUD-1 does not

16  show that the funds due borrower, Clark, were to be paid over to the escrow's principal,

17  Farris-Ellison.  *Id.*

18          Lenders Escrow prepared a check payable to Clark dated October 21, 2008 in

19  the amount of $49,213.07.  Defendant's Exhibit 1; Plaintiff's Exhibit 31, Checks.

20          Lenders Escrow prepared a check payable to Clark dated October 23, 2008 in

21  the amount of $1,632.00.  Defendant's Exhibit 4.  There is no dispute that this check

22  was endorsed by Clark, and the funds paid to him as surplus refinancing loan proceeds

23  due to him as borrower.  Trial Transcript, June 21, 2021, at 105 (Clark Testimony).

24  Farris-Ellison testified that she never discussed this check with Clark and that it was not

25  part of the alleged loan of the surplus refinancing loan proceeds that he made to her.

26  Trial Transcript, September 8, 2021, at 64 (Farris-Ellison Testimony). Since Clark

27  received this amount of $1,632.00 from the surplus refinancing loan proceeds, the

28  balance of unpaid surplus refinancing proceeds is calculated to be $49,213.07, which

1  was the amount stated on the other check prepared by Lenders Escrow.

2      A check for the amount of $49,213.07 on the Lender's Escrow account was

3  prepared, that is, Farris-Ellison's escrow personnel prepared the check and were going

4  to give him the check.  Trial Transcript, September 8, 2021, at 50 (Farris-Ellison

5  Testimony); Defendant's Exhibit 2.  The check was never given to Clark.  Trial

6  Transcript, September 8, 2021, at 50 (Farris-Ellison Testimony) ("Q.  The check was

7  never given to him, then, right?  A.  Not to my knowledge.  Q. It was not physically

8  handed to him, right, never handed to him?  I don't think it was ever handed to him.").

9  Clark never received his surplus loan proceeds from the check.  Trial Transcript, July

10  15, 2021, at 109 (Farris-Ellison Testimony) ("Q  Did Mr. Clark get that money [i.e., the

11  gross loan proceeds of $58,549.07 deposited into escrow by the title company after

12  existing liens were paid].  A.  No.").

13      According to Farris-Ellison, on the day escrow closed, she offered the check to

14  Clark, but he refused to take it, saying that she needed the money and that she could

15  use the money as a loan because he no longer needed it.  Trial Transcript, July 15,

16  2021, at 97, 111 (Farris-Ellison Testimony).  Farris-Ellison testified that on the date that

17  escrow closed on October 21, 2008, Clark came to her office, and he told her that he

18  did not want the check and that she could keep the check and use the money for what

19  she needed.  *Id.* at 97-99.  Farris-Ellison testified that she offered the check to Clark, but

20  he told her to keep it.  *Id.*  at 111 ("Q.  And did you offer the check to Mr. Clark?  A.

21  Yes.  Q.  And what was his response?  A.  He told me to keep it, hold onto it because I

22  —- he wanted to help me keep the doors open and he didn't need it at the time because

23  he had another event that he had money came into him that he didn't --."); *see also,*

24  Trial Transcript, September 8, 2021, at 50 (Farris-Ellison Testimony).

25      Later, on September 8, 2021, Farris-Ellison elaborated on her testimony on July

26  15, 2021 about what was the other event that caused Clark to make the alleged loan

27  from his surplus refinancing proceeds.  Farris-Ellison's testimony is that Clark lent to her

28  the entire amount from the escrow for the refinancing due him as the borrower:

Q.      So your side of the story is that . . . the surplus refinancing proceeds were lent to you and held by you with Mr. Clark's consent? That's your testimony?

A.      Yes.  Yes, Your Honor.

Q.      That the entire. . . amount was a loan to you?

A.      Yes, sir.  But I didn't use the entire amount.

Trial Transcript, July 15, 2021, at 29 (Farris-Ellison Testimony).

According to Farris-Ellison, there were no repayment terms for this alleged loan, that is, there is no interest on the loan, and there is no due date for repayment. Trial Transcript, September 8, 2021, at 51-52 (Farris-Ellison Testimony).

Regarding repayment of the alleged loans to Clark, Farris-Ellison testified that it was her intention to repay him that money: "Of course, yes."  Trial Transcript, July 15, 2021, at 11 (Farris-Ellison Testimony).  Answering her counsel's question how she would have repaid Clark, if possible, Farris-Ellison testified, "I probably would have worked out some kind of arrangement with him.  We just hadn't done that."  Id.  Asked why Farris-Ellison had an inability to work out a repayment arrangement with Clark, she testified, "Well, when he loaned me the money eventually what he said to me was, 'Don't worry about.  We'll make more money later.'  So it just never came up and this was never discussed."  Id.

Regarding the arrangement for Farris-Ellison's disbursements to Clark from the alleged loan proceeds, she testified as follows:

Q.      . . .what was the arrangement between you and Mr. Clark about his getting payments from that amount?

A.      We hadn't made any arrangements because when he offered . . . this loan to me.  I didn't ask for it.  But when he offered it to me his response --- what he said to me was, you know, "We want to keep your doors open.  Just go ahead and use the money in the escrow" because he had other monies from something else that had happened in his life, another event.

> Q.      Yeah.  But this arrangement about his . . . making payments on his behalf, what was the agreement between you and him about that?
>
> A.      He would . . . call me or have somebody contact me and say he wanted me to pay --- most times . . . he told me what he wanted me to pay and to who he wanted me to pay.  And that's just what those payments were about. . . . [W]hen he wanted money to himself he would tell me to give him a check for X amount of dollars, his daughter, his mother, whoever he wanted me to pay.  So I didn't use all the funds inasmuch as he gave me access to all the funds. . . . I left it there and I used it as I needed it.

Trial Transcript, July 15, 2021, at 29 (Farris-Ellison Testimony).  Farris-Ellison testified that she and Clark had no written agreement about his asking for his money back.  Trial Transcript, September 8, 2021, at 77 (Farris-Ellison Testimony).  Thus, based on this testimony, it appears that Farris-Ellison and Clark never had a specific discussion about this repayment arrangement.

Farris-Ellison's testimony is that when Clark's "original plan" was for her as the escrow to hold onto his surplus refinancing proceeds to pay the mortgage on his house every month, but then something came up that he had money from elsewhere and did not need the money any more and he knew that she needed money to keep her doors open, he then just told her to hold the money and use it. Trial Transcript, June 21, 2021, at 188-190 (Farris-Ellison Testimony); Trial Transcript, September 8, 2021, at 48-49 (Farris-Ellison Testimony).  However, the HUD-1 does not reflect this arrangement that the funds due Clark as borrower would be held by Farris-Ellison or her escrow business after the close of escrow.  Plaintiff's Exhibit 19, HUD-1.

Clark testified that the check for the surplus refinancing loan proceeds in the amount of $49,213.07 was never tendered to him.  Trial Transcript, June 21, 2021, at 40-41 (Clark Testimony); Plaintiff's Exhibit 35.  That is, Farris-Ellison never gave it to him.  *Id.*  Clark testified that he had not seen it until Farris-Ellison produced it in her DRE disciplinary hearing in 2012.  *Id.*  Clark testified that at no time did he ever authorize Farris-Ellison to use his surplus refinancing loan proceeds.  Trial Transcript, September 8, 2021, at 176 (Clark Testimony).

Clark denied that he informed Farris-Ellison that he did not want to cash the check and that he informed her that she could use the money as a loan.  Trial Transcript, June 21, 2021, at 103 (Clark Testimony).  When Clark was asked during cross-examination, he denied that he informed Farris-Ellison that he received or was in the process of receiving at that time approximately $200,000 from the City of Los Angeles related to the incident at his house and that he informed her that he did not need the rest of the surplus refinancing loan proceeds.  *Id.*  As to Farris-Ellison's testimony that Clark told her that he was coming into money and did not need the surplus loan proceeds, he testified:  "That's not true.  I need money all the time."  Trial Transcript, December 2, 2021, at 39 (Clark Testimony).

Clark testified on the day that escrow closed on October 21, 2008, he was unable to go to Farris-Ellison's office to collect the check because he had been taken into police custody over the incident involving his daughter.  Trial Transcript, June 21, 2021, at 55, 57, 88 (Clark Testimony); Trial Transcript, September 8, 2021, at 179 (Clark Testimony). Clark testified that his daughter was shot in a "home invasion", and he got into an altercation with the Los Angeles Police Department over the incident and was taken into custody.  *Id.*  Clark testified that he was in police custody for almost a month. Trial Transcript, September 8, 2021, at 179 (Clark Testimony).

Clark testified that the incident occurred in October 2008, that he was personally detained by the police, that later he threatened or brought a legal action against the officers who detained him and that he received a financial settlement with the City of Los Angeles.  Trial Transcript, June 21, 2021, at 88-90 (Clark Testimony).  According to Clark, the incident occurred four or five days before the date that escrow closed.  Trial Transcript, September 8, 2021, at 193 (Clark Testimony).

Farris-Ellison testified that she saw the incident reported on the television, and she went to Clark's house immediately to give him and his daughter support. Trial Transcript, June 21, 2021, at 206 (Farris-Ellison Testimony); Trial Transcript, September 8, 2021, at 175-177 (Farris-Ellison Testimony).  She also testified that she

went to the hospital where Clark's daughter was being treated and saw both of them.

Trial Transcript, September 8, 2021, at 169 (Farris-Ellison Testimony).

According to Farris-Ellison, Clark "received some proceeds I know from that

incident" and stated: "I don't know from who all from whatever, but that's probably why

he said that he didn't need that money at that time [i.e., Clark's surplus refinancing loan

proceeds]." Trial Transcript, June 21, 2021, at 206 (Farris-Ellison Testimony). Thus,

Farris-Ellison in her testimony stated, "That's why he [Clark] said, 'Don't worry about it.

We'll make more money later.' That's why he – he said he didn't need it then at the

time. . . ." *Id.*

Clark's residence suffered significant damage during the incident when his

daughter was injured and the police responded and entered the house, and used tear

gas in the house. Trial Transcript, September 8, 2021, at 241 (Clark Testimony). Clark's

insurance company covered the repair of the damage, which amounted to $42,000. *Id.*

at 241-259. Clark also reached a monetary settlement with the City of Los Angeles

regarding the damage. *Id.*

Only after Clark was released from custody a month later, he went to Farris-

Ellison's office to collect the check. Trial Transcript, September 8, 2021, at 179-180

(Clark Testimony); Trial Transcript, June 21, 2021, at 58-59 (Clark Testimony). When

Clark got to the office, however, he found that the door was locked, and he tried calling

the office, but there was no answer. *Id.* Clark said that he tried to go to the office four

or five times, but the door was always locked, and the phone was cut off. *Id.*

Clark then waited one night outside her office with some of his workers, including

Melvin Sims, until she came out, and she did, and Clark confronted her in the parking lot

outside her building. Trial Transcript, June 21, 2021, at 55-60 (Clark Testimony). Clark

testified about what Farris-Ellison said to him in their encounter in the parking lot, "I

thought you had gone to prison," and said she spent the money. She said, "I spent your

money. I don't have it. What you going to do? I did this before. I got away with it."

*Id.* at 55. According to Clark, he concluded that Farris-Ellison was just trying to provoke

1  him, but he was not going to be provoked, and said that his workers who went him told

2  him that he should take her to court.  *Id.*  Clark testified that his parking lot confrontation

3  with Farris-Ellison occurred in November 2008.  Trial Transcript, December 2, 2021, at

4  40 (Clark Testimony).  Farris-Ellison testified that she did not recall any such meeting

5  with Clark in her parking lot.  Trial Transcript, September 8, 2021, at 164-165 (Farris-

6  Ellison Testimony).  Farris-Ellison denied that she made any such statement to Clark

7  then or at any other time.  Trial Transcript, June 21, 2021, at 245 (Farris-Ellison

8  Testimony).

9        Melvin Sims is a former employee of Clark's, doing labor for Clark on

10  construction jobs, and work for Clark in 2008-2009 before Sims moved to Louisiana in

11  2009-2010.  Trial Transcript, June 21, 2021, at 22 (Sims Testimony).  In about

12  November 2008, Sims went with Clark to Farris-Ellison's business office of Just That EZ

13  Financing on Crenshaw Boulevard when Clark went to ask for money for work that they

14  did for work for her and Clark's surplus refinancing loan proceeds, and they waited for

15  her to come out of her office to a parking lot outside her office.  *Id.* at 15-18; Trial

16  Transcript, June 21, 2021, at 54 (Clark Testimony).   Sims testified that Farris-Ellison

17  came out of her office and talked to Clark in the parking lot and that he heard a

18  conversation between Clark and Farris-Ellison in the parking lot.  *Id.*  Sims testified that

19  Farris-Ellison told Clark that she took the money, bought a car and made payments on a

20  house, saying to Clark, "Nothing you can do about it."  *Id.* at 19.

21        According to Farris-Ellison, Clark never asked her for the entire surplus

22  refinancing loan proceeds until a year after escrow for the loan closed, and she heard

23  from Flagstar Bank that Clark had contacted it about getting the loan proceeds.  Trial

24  Transcript, September 8, 2021, at 82-83 (Farris-Ellison Testimony).

25        <u>Farris-Ellison's Disposition of Clark's Residential Loan Refinancing Proceeds and</u>

26        <u>Alleged Loans to Her</u>

27        After escrow for Clark's refinancing loan closed in October 2008, Lenders Escrow

28  held Clark's surplus refinancing loan proceeds in its one checking account.  Trial

Transcript, July 15, 2021, at 69 (Farris-Ellison Testimony); Trial Transcript, September 8, 2021, at 60 (Farris-Ellison Testimony).  Farris-Ellison testified that these funds stayed in the Lenders Escrow checking account and that she never put them in her personal bank account.  *Id.*  Farris-Ellison testified that she disbursed Clark's surplus refinancing loan proceeds to herself and to Clark or his designees from this account.  Trial Transcript, June 21, 2021, at 207 (Farris-Ellison Testimony); Trial Transcript, September 8, 2021, at 49-50 (Farris-Ellison Testimony).  According to Farris-Ellison, when she withdrew Clark's surplus refinancing loan proceeds from the Lenders Escrow account for herself, it was with his consent because he lent her the money, and she did not need to obtain his consent for a specific disbursement to herself.  *Id.*

Farris-Ellison testified that she used Clark's loan proceeds to pay her bills.  Trial Transcript, July 15, 2021, at 73, 77 (Farris-Ellison Testimony). *Id*. at 73, 77.  Also, according to Farris-Ellison, when she withdrew Clark's surplus refinancing loan proceeds for Clark or his designee, it was always at his instruction for his purposes, for which she did not know.  Trial Transcript, June 21, 2021, at 207 (Farris-Ellison Testimony).

For the disciplinary hearing in 2012 before the DRE on Clark's complaint against Farris-Ellison, she created a ledger of her transactions with Clark based on his alleged loans, which listed the loans made and the disposition of the loan proceeds based on her recollection.  Trial Transcript, July 15, 2021, at 19-28 (Farris-Ellison Testimony); Trial Transcript, September 8, 2021, at 39-40 (Farris-Ellison Testimony). Defendant's Exhibit 1.  Farris-Ellison testified that she created the ledger for her DRE disciplinary hearing and that the ledger reflected her knowledge of these transactions, though the ledger was created "after the fact." *Id.*  According to Farris-Ellison, some of the money that Clark allegedly lent her was used by her for her purposes based on the implicit authorization by Clark that he was lending her the money for her to use, and some of the money was "repaid" to Clark in disbursements from the loan proceeds to pay Clark or his designees at his instruction.  Trial Transcript, July 15, 2021, at 26-30 (Farris-

Ellison Testimony).

Farris-Ellison's DRE ledger indicates from a total of Clark's surplus refinancing loan proceeds of $50,845.07, $28,407.47 are "Clark Payments," i.e., disbursements to or on behalf of Clark, and $22,437.60 are "Ellison Debits," i.e., disbursements to or on behalf of Farris-Ellison.  Defendant's Exhibit 3.  The disbursements were made by checks drawn on the checking account of Lenders Escrow or ATM withdrawals by Farris Ellison.  *Id.*  All of the funds are now spent.  Trial Transcript, September 8, 2021, at 53 (Farris-Ellison Testimony).

Farris-Ellison's DRE ledger shows that she disbursed a total of $22,437.60 to herself from Clark's surplus refinancing proceeds, which she testified that she was authorized by Clark based on the alleged loan he made to her.  Defendant's Exhibit 1. Farris-Ellison testified that when she disbursed these funds to herself or on her behalf that she did not talk to Clark when she was writing a check to herself because she felt she did not need to because he was lending the money and she was just using the money that he lent her. Trial Transcript, September 8, 2021, at 71 (Farris-Ellison Testimony). Clark denied that he ever authorized Farris-Ellison to spend these funds. Trial Transcript, June 21, 2021, at 55, 57, 105 (Clark Testimony); Trial Transcript, September 8, 2021, at 203 (Clark Testimony).  Farris-Ellison admitted that she used these funds for her purposes.  Trial Transcript, September 8, 2021, at 54, 65-66, 70-74 (Farris-Ellison Testimony). Farris-Ellison also admitted that she has not repaid these funds to Clark.  Accordingly, this amount of $22,437.60 is admitted part of the debt that Farris-Ellison owes to Clark.

Farris-Ellison claims that her DRE ledger shows that she disbursed payments of $28,407.47 to or on behalf of Clark.  Defendant's Exhibit 3.  This amount includes the escrow check of $1,632.00 cashed by Clark, which amount is not in dispute.  Trial Transcript, June 21, 2021, at 105 (Clark Testimony).  Subtracting this amount leaves $26,775.47, which amount Farris-Ellison contends should be considered repayment of her loan from Clark from the surplus refinancing loan proceeds.  Clark denied that

Farris-Ellison kept this money in her account for him to direct her at times to make

payments for various things, including directly to him through her escrow account.  Trial

Transcript, June 21, 2021, at 104 (Clark Testimony); Trial Transcript, December 2,

2021, at 53 (Clark Testimony).  Clark testified that the payments to him were for other

construction work that he did on her buildings and that he expected to be paid for this

work.  Trial Transcript, June 21, 2021, at 132 (Clark Testimony); Trial Transcript,

December 2, 2021, at 53 (Clark Testimony).

According to Farris-Ellison, the Clark Payments on her DRE ledger, Defendant's

Exhibit 1, were the following:

(1) Check No. 1284 dated October 23, 2008 in the amount of $1,632.00 payable to

James Clark (a copy of the check is page 1 of Defendant's Exhibit 3, Cancelled

Checks).[7] Clark does not dispute that he received the check and endorsed it for

payment to him as due to borrower from the surplus refinancing loan proceeds as

discussed above.  Trial Transcript, June 21, 2021, at 105 (Clark Testimony).

Clark did state that these funds were supposed to be used to pay taxes, but he

admitted getting the check and cashing it for himself.  *Id.*

(2) Check No. 1286 dated November 16, 2008 in the amount of $3,000.00 payable

to James Clark (a copy of the check is page 3 of Defendant's Exhibit 4).  Clark

received the check and endorsed it for payment to him, but he disputes that

these funds were paid to him as payment due to him as borrower from the

surplus refinancing loan proceeds.  Trial Transcript, June 21, 2021, at 106 (Clark

Testimony); Trial Transcript, September 8, 2021, at 176 (Clark Testimony).  Clark

testified that the payments made to him were for other work he did on her

buildings. Trial Transcript, June 21, 2021, at 131 (Clark Testimony).   Clark

testified that he asked for this check from Farris-Ellison to pay for windows that

---

[7]  Defendant's Exhibit List lists the Cancelled Checks as Exhibit 3, but counsel for Farris-Ellison during the
examination of the witnesses referred to the Cancelled Checks as Exhibit 4.  The bench copy in the binder of
Defendant's Exhibits had the Cancelled Checks behind the tab for Exhibit 4 as the checks were not inserted in the
proper place according to Defendant's Exhibit List.  The court refers to the exhibits as listed on Defendant's Exhibit
List.

he was replacing on her property.  *Id*.  Clark denied that he was asking her for money to replace windows in his building.  *Id*.  Clark testified that as a contractor, he charged for labor on a construction project, but his clients paid for materials on the project.  Trial Transcript, September 8, 2021, at 204 (Clark Testimony). Farris-Ellison testified that Clark told her to write the check and that it was not for work he did for her. Trial Transcript, September 8, 2021, at 59 (Farris-Ellison Testimony).

(3) Check No. 1289 dated December 9, 2008 in the amount of $2,000.00 payable to Vergie Clark (a copy of the check is page 5 of Defendant's Exhibit 4).  Clark admitted that Vergie Clark is his mother.  Trial Transcript, June 21, 2021, at 107 (Clark Testimony). The copy of the check indicates Vergie Clark received the check and endorsed it for payment to her.  Defendant's Exhibit 4 at 5.  Clark was asked whether the check in the amount of $2,000 says a loan was paid from Farris-Ellison's bank account to Vergie Clark, Clark acknowledged that is what the document said, but did not admit that the check was written at his request. Trial Transcript, June 21, 2021, at 107 (Clark Testimony).  Clark disputes that these funds were paid on his behalf as payment due to him as borrower from the surplus refinancing loan proceeds.  Trial Transcript, June 21, 2021, at 106 (Clark Testimony); Trial Transcript, September 8, 2021, at 176 (Clark Testimony).

(4)  Check No. 1293 dated November 16, 2008 in the amount of $1,199.00 payable to Legacy Garage Doors (a copy of the check is page 6 of Defendant's Exhibit 4). The check went to Legacy Garage Doors, which endorsed it for payment.  Clark disputes that these funds were paid on his behalf as payment due to him as borrower from the surplus refinancing loan proceeds.  Trial Transcript, June 21, 2021, at 109 (Clark Testimony); Trial Transcript, September 8, 2021, at 176, 203-207 (Clark Testimony).  According to Clark, she called him and told him that she needed two garage doors, and he called Legacy Garage Doors for her.  *Id*. Legacy Garage Doors sent someone out to look at the site, and Clark told

Legacy to quote her a price, which he says she agreed to, and Legacy installed the doors and invoiced her.  *Id.*  Clark said he had told Legacy to collect its check from Farris-Ellison since it was her job (i.e., her project on her property).  *Id.*  Farris-Ellison testified that Clark told her to write this check and denied that the check was for her doors.  Trial Transcript, September 8, 2021, at 64-65, 151 (Farris-Ellison Testimony).

(5)     Check No. 1295 dated December 16, 2008 in the amount of $1,000.00 payable to Royce Moore (a copy of the check is page 8of Defendant's Exhibit 4). Clark admitted that Royce Moore is his daughter.  Trial Transcript, June 21, 2021, at 108 (Clark Testimony). The copy of the check showed Royce Moore received the check and endorsed it for payment to her, but Clark disputes that these funds were paid on his behalf as payment due to him as borrower from the surplus refinancing loan proceeds, saying that he did not know about the check and that he did not authorize it.  Trial Transcript, September 8, 2021, at 176, 211 (Clark Testimony).  Farris-Ellison testified that Clark told her to write this check. Trial Transcript, September 8, 2021, at 66 (Farris-Ellison Testimony).

(6)     Check No. 1297 dated December 18, 2008 in the amount of $750.00 payable to Delco Disposal (a copy of the check is page 10 of Defendant's Exhibit 4).  The check went to Delco Disposal, which endorsed it for payment.  Clark disputes that these funds were paid on his behalf as payment due to him as borrower from the surplus refinancing loan proceeds.  Trial Transcript, June 21, 2021, at 108 (Clark Testimony); Trial Transcript, June 21, 2021, at 106 (Clark Testimony); Trial Transcript, September 8, 2021, at 176 (Clark Testimony).  Clark originally on cross-examination denied that he was familiar with this check, that Farris-Ellison paid Delco on his behalf and that he knew what Delco was.  *Id.*  Farris-Ellison testified that Clark requested her to write this check and did not know the purpose of the check.  Trial Transcript, September 8, 2021, at 66-67 (Farris-Ellison Testimony).  The check relates to an invoice from Delco Disposal

which was addressed to Farris-Ellison at her business address at 4700
Crenshaw Boulevard, but stating it was for James Clark listing his home address
on Laconia Boulevard.  Trial Transcript, September 8, 2021, at 78-80 (Farris-
Ellison Testimony); Defendant's Exhibit 5.  The Delco Disposal invoice stated
that it was for a 40 cubic yard dumpster.  Defendant's Exhibit 5.  Farris-Ellison
testified that she did not order use of a dumpster, that she did not have use for a
dumpster, that she was not having any construction work done at the time on her
building and that she did not know the reason for the dumpster.  Trial Transcript,
September 8, 2021, at 78-80 (Farris-Ellison Testimony). *Id*.  According to Clark,
he ordered the dumpster bin because it was needed for plumbing work that his
crew was doing on Farris-Ellison's duplex on 36th Street in Los Angeles and that
the charge for the dumpster was billed to her by the materials supplier, Delco,
with her consent, and she paid the bill, though he did not know it was from his
refinancing proceeds.  Trial Transcript, September 8, 2021, at 207-210 (Clark
Testimony).  Farris-Ellison acknowledged that Clark did repairs on her duplex on
36th Street in Los Angeles, but denied that the dumpster expense was for this
property.  Trial Transcript, June 21, 2021, at 152-155, 218 (Farris-Ellison
Testimony).  Clark denied that the Delco dumpster was used on his property for
repair of damage from the home invasion incident.  Trial Transcript, September
8, 2021, at 241-255 (Clark Testimony).

(7) Check No. 1298 dated December 22, 2008 in the amount of $5,000.00 payable
to James Clark (a copy of the check is page 11 of Defendant's Exhibit 3).  Clark
testified that he received the check and endorsed it for payment to him because
these funds were paid to him for labor for construction work that his crew
performed for Farris-Ellison, and not as payment due to him as borrower from the
surplus refinancing loan proceeds.  Trial Transcript, June 21, 2021, at 109-110,
131(Clark Testimony); Trial Transcript, September 8, 2021, at 211-212 (Clark
Testimony).  Clark testified the construction work was consisted of painting and

patching holes in the walls in an apartment building on Vermont Avenue in Los Angeles which Clark said was jointly owned by Farris-Ellison and her daughter after one of the tenants moved out.  *Id.*  Farris-Ellison testified that Clark just told her to write this check and that it represented repayment of her loan from him.  Trial Transcript, September 8, 2021, at 67-68 (Farris-Ellison Testimony).  Farris-Ellison said that there was no discussion about this particular check and that "whatever he told me to pay, I just did."  *Id.*

(8)      Check No. 1299 dated December 22, 2008 in the amount of $500.00 payable to Patricia Morton (a copy of the check is page 12 of Defendant's Exhibit 3).  The check shows that Patricia Morton received the check and endorsed it for payment to her, but Clark disputes that these funds were paid on his behalf as payment due to him as borrower from the surplus refinancing loan proceeds, denying that he directed Farris-Ellison to write this check.  Trial Transcript, June 21, 2021, at 55, 57, 110-111(Clark Testimony).  Farris-Ellison testified that Clark requested her to write this check and that she thought Patricia Morton was one of Clark's girlfriends.  Trial Transcript, September 8, 2021, at 68-69, 95 (Farris-Ellison Testimony).  Clark testified that he did not know Patricia Morton.  Trial Transcript, June 21, 2021, at 110 (Clark Testimony).

(9)      Check No. 1300 dated December 22, 2008 in the amount of $1,800.00 payable to Odell Farris (a copy of the check is page 13 of Defendant's Exhibit 3).  Odell Farris received the check and endorsed it for payment to her, but Clark disputes that these funds were paid on his behalf as payment due to him as borrower from the surplus refinancing loan proceeds.  Trial Transcript, September 8, 2021, at 212-214 (Clark Testimony).  Clark admitted that he knew Odell Farris because he previously did a construction job for her, but he did not know anything about the $1,800 check.  *Id.*  Farris-Ellison admitted that Odell Farris is her sister-in-law, but testified that Clark knew Odell Farris as they were both contractors and that Clark told Farris-Ellison to write out a check to Odell

Farris as he was making a loan to her. Trial Transcript, September 8, 2021, at 69-70 (Farris-Ellison Testimony).  Clark testified that he did not agree to make any loan to Odell Farris, whom Clark thought was Farris-Ellison's cousin.  Trial Transcript, June 21, 2021, at 111 (Clark Testimony).

(10)     Credit card charge on December 22, 2008 in the amount of $608.50 for Vergie Clark (a copy of the credit card receipt is Defendant's Exhibit 6).  The charge indicates that it was made for Vergie Clark, but Clark disputes that the charge was made on his behalf as payment due to him as borrower from the surplus refinancing loan proceeds.  Trial Transcript, June 21, 2021, at 106 (Clark Testimony); Trial Transcript, September 8, 2021, at 176 (Clark Testimony).  Farris-Ellison testified that Clark requested her to make this charge.  Trial Transcript, September 8, 2021, at 84 (Farris-Ellison Testimony).  The credit card charge receipt indicates that the charge was billed to Farris-Ellison, but the item ordered, a Nintendo Wii Console HD Ready with accessories was shipped to Vergie Clark.  Defendant's Exhibit 6.  Farris-Ellison admitted that she ordered this item, but that Clark had her order it as a gift for his relatives. Trial Transcript, September 8, 2021, at 84 (Farris-Ellison Testimony).

(11)     Credit card charge on December 22, 2008 in the amount of $592.97 for Luanitra Clemmons (a copy of the credit card receipt is Defendant's Exhibit 7).  The charge indicates that it was made for Luanitra Clemmons, but Clark disputes that the charge was made on his behalf as payment due to him as borrower from the surplus refinancing loan proceeds.  Trial Transcript, June 21, 2021, at 106 (Clark Testimony); Trial Transcript, September 8, 2021, at 176 (Clark Testimony).  Farris-Ellison testified that Clark requested her to make this charge.  Trial Transcript, September 8, 2021, at 84 (Farris-Ellison Testimony).  The credit card charge receipt indicates that the charge was billed to Farris-Ellison, but the item ordered, a Nintendo Wii System 2 Player Bundle was shipped to Luanitra Clemmons.  Defendant's Exhibit 7.  Farris-Ellison admitted that she ordered this

item, but that Clark had her order it as a gift for his relatives. Trial Transcript, September 8, 2021, at 84 (Farris-Ellison Testimony).

(12)    Check No. 1303 dated January 14, 2009 in the amount of $500.00 payable to Royce Moore (a copy of the check is page 16 of Defendant's Exhibit 3). The check shows that Royce Moore received the check and endorsed it for payment to her, but Clark disputes that these funds were paid on his behalf as payment due to him as borrower from the surplus refinancing loan proceeds. Trial Transcript, June 21, 2021, at 106 (Clark Testimony); Trial Transcript, September 8, 2021, at 176 (Clark Testimony). Clark testified that he did not know anything about this check. Trial Transcript, June 21, 2021, at 111-112 (Clark Testimony). Clark acknowledged that Royce Moore was the daughter involved in the home invasion shooting incident. *Id.* Clark denied that he requested the check or that he knew what was its purpose. Trial Transcript, September 8, 2021, at 214 (Clark Testimony). Farris-Ellison testified that Clark told her to write this check. Trial Transcript, September 8, 2021, at 71-72 (Farris-Ellison Testimony).

(13)    Check No. 1307 dated January 29, 2009 in the amount of $1,000.00 payable to Charles Ellis (a copy of the check is page 19 of Defendant's Exhibit 3). Charles Ellis received the check and endorsed it for payment to her, but Clark disputes that these funds were paid on his behalf as payment due to him as borrower from the surplus refinancing loan proceeds. Trial Transcript, September 8, 2021, at 176, 214-215 (Clark Testimony). Clark testified that he did not know who Charles Ellis is or what the purpose of the check was and that he believed that Charles Ellis might have been her husband or boyfriend. *Id.* Farris-Ellison testified that Clark requested her to write this check and did not know who Mr. Ellis was, saying that he was not her husband. Trial Transcript, September 8, 2021, at 73, 95-96 (Farris-Ellison Testimony).

(14)    Check No. 1308 dated February 2, 2009 in the amount of $5,000.00

payable to James Clark (a copy of the check is page 20 of Defendant's Exhibit 3). Clark received the check and endorsed it for payment to him, but he disputes that these funds were paid to him as payment due to him as borrower from the surplus refinancing loan proceeds, saying that the funds were payment for construction work that he was doing for Farris-Ellison covering partial payment for several projects, including painting at the Vermont apartment building jointly owned by Farris-Ellison and her daughter. Trial Transcript, September 8, 2021, at 176, 215 (Clark Testimony). Farris-Ellison denied that this check was payment for construction work and that she wrote the check because Clark wanted his loan money back. Trial Transcript, September 8, 2021, at 74 (Farris-Ellison Testimony).

(15)    Check No. 1310 dated February 9, 2009 in the amount of $600.00 payable to Mike Jones (a copy of the check is page 22 of Defendant's Exhibit 3). Clark received the check and endorsed it for payment to him, but he disputes that these funds were paid to him as payment due to him as borrower from the surplus refinancing loan proceeds. Farris-Ellison testified that Clark requested her to write this check and did not know who Mike Jones was. Trial Transcript, September 8, 2021, at 73 (Farris-Ellison Testimony). Farris-Ellison admitted that she wrote the notation "For Roof," on the check, but did not recall writing it. *Id.* at 75-76.

(16)    Check No. 1312 dated February 9, 2009 in the amount of $125.00 payable to James Clark (no copy of this check was offered as part of Defendant's Exhibit 3). Clark disputes that these funds were paid to him as payment due to him as borrower from the surplus refinancing loan proceeds. Trial Transcript, June 21, 2021, at 106 (Clark Testimony); Trial Transcript, September 8, 2021, at 176 (Clark Testimony). Clark testified that the payments made to him were for other work he did on her buildings. Trial Transcript, June 21, 2021, at 131 (Clark Testimony)

(17)　　　Check No. 1313 dated February 9, 2009 in the amount of $100.00 payable to James Clark (no copy of this check was offered as part of Defendant's Exhibit 3).  Clark disputes that these funds were paid to him as payment due to him as borrower from the surplus refinancing loan proceeds.  Trial Transcript, June 21, 2021, at 106 (Clark Testimony); Trial Transcript, September 8, 2021, at 176 (Clark Testimony).  Clark testified that the payments made to him were for other work he did on her buildings. Trial Transcript, June 21, 2021, at 131 (Clark Testimony)

(18)　　　Check No. 1314 dated February 9, 2009 in the amount of $500.00 payable to James Clark (no copy of this check was offered as part of Defendant's Exhibit 3).  Clark disputes that these funds were paid to him as payment due to him as borrower from the surplus refinancing loan proceeds.  Trial Transcript, June 21, 2021, at 106 (Clark Testimony); Trial Transcript, September 8, 2021, at 176 (Clark Testimony).  Clark testified that the payments made to him were for other work he did on her buildings. Trial Transcript, June 21, 2021, at 131 (Clark Testimony)

(19)　　　Check No. 1315 dated February 17, 2009 in the amount of $2,500.00 payable to James Clark (a copy of the check is page 24 of Defendant's Exhibit 3).  Clark received the check and endorsed it for payment to him, but he disputes that these funds were paid to him as payment due to him as borrower from the surplus refinancing loan proceeds.  Trial Transcript, June 21, 2021, at 106 (Clark Testimony); Trial Transcript, September 8, 2021, at 176 (Clark Testimony). Farris-Ellison testified that Clark requested this check as partial repayment of his loan to her and that it was not payment for construction work that he did for her. Trial Transcript, September 8, 2021, at 76-77 (Farris-Ellison Testimony).  Clark testified that the payments made to him were for other work he did on her buildings. Trial Transcript, June 21, 2021, at 131 (Clark Testimony)

(20)　　　Check No. 1316 dated February 25, 2009 in the amount of $600.00

payable to James Clark (no copy of this check was offered as part of Defendant's

Exhibit 3).  Clark disputes that these funds were paid to him as payment due to

him as borrower from the surplus refinancing loan proceeds.  Clark testified that

the payments made to him were for other work he did on her buildings. Trial

Transcript, September 8, 2021, at 176 (Clark Testimony).  Clark testified that the

payments made to him were for other work he did on her buildings. Trial

Transcript, June 21, 2021, at 131 (Clark Testimony).

As discussed previously, Clark testified that during the 2008-2009 time period, he

was doing construction work for Farris-Ellison on her buildings, including her Lynwood

rental property, her 36th Street duplex, her business office and the apartment building on

Vermont Avenue owned by her and her daughter.  Trial Transcript, September 8, 2021,

at 177-187 (Clark Testimony).  Clark testified that he asked for payments for this work

and that he understood that the payments made for this work and that Farris-Ellison

was using Clark's surplus refinancing loan proceeds to pay him for his work.  *Id.*  Clark

was asked by the court at trial why he continued to work for Farris-Ellison if he were so

mad at her about not getting his refinancing loan proceeds, he answered:

> I had jobs started and I agreed to do the job and complete the job.  In
> order for me to take her to court – I can't walk in the court and tell the
> judge, I just walked off the job.  I have to get back to – if I go – take her to
> court I have to tell the judge I finished what I agreed and then I can sue
> her.  That's the reason why.  I just couldn't stop in the middle of the job,
> house all tore up, and she had gave me a deposit.  I couldn't do that.  So I
> had to finish the job and then take her to court, but she paid me for the
> job.  I have no reason to do the job, had no reason to go back to deal with
> the problem over there.  But she paid me for the job that I worked.  Now,
> she's saying she took my money and paid me, then we've got a problem –
> a problem.  Then I need to put a lien on the property because I have that
> right because she didn't pay me for it.

Trial Transcript, December 2, 2021, at 41 (Clark Testimony); Trial Transcript, December

5, 2021, at 29 (Clark Testimony) ("I was going to quit . . . but the point is I had this

building tore up.  I had to put it back together and finish it and I was almost finished and

completing it.")

.Third Alleged Loan of $20,000 by Clark to Farris-Ellison on January 2, 2009

Clark gave Farris-Ellison a cashier's check payable dated January 2, 2009 to
Lenders Escrow in the amount of $20,000. Trial Transcript, June 21, 2021, at 61 (Clark
Testimony); Plaintiff's Exhibit 31.  According to Clark, Farris-Ellison told him that she
needed the money to straighten out the problem with his taxes and with Flagstar Bank,
but he never got the money back.  *Id.* at 61, 65.

Clark contends that he gave her the $40,000 because she asked him for that
amount because she needed it to deal with Flagstar Bank and to fix the problems that
he identified.  Trial Transcript, June 21, 2021, at 77 (Clark Testimony).  According to
Clark, Farris-Ellison asked him for money "to fix the transaction," and as he testified it
was "to fix the transaction, get the transaction on track, like she said.  She said had to
go back and start from day one and get it on track because Flagstar, at the time, was
asking for $10,000."  Trial Transcript, June 21, 2021, at 64-65 (Clark Testimony).  Also,
according to Clark, Flagstar was threatening foreclosure on its loan to Clark.  *Id.* at 64-
66.

Asked why Clark gave Farris-Ellison another $20,000 check in January 2009
after he confronted her earlier about not getting all of his refinancing loan proceeds, he
testified:

> Q.    So why would you give her a check to fix the transaction if she told
> you in October she took your escrow money, you know, you'll – what you
> were supposed to get out of the loan refinancing and she spent it on, you
> know, her mortgage and her car.  Why would you give her $20,000?
>
> A.    Because I didn't know no better and my point is, I was having a
> major problem with the bank.  The bank kept talking about putting us on
> the street, foreclosing, and I had to deal with that because I was tired of
> the bank calling.  When you got – when you have a wife and family in the
> house, you don't want them on the street.
>
> Q.    . . . Right.  So you're concerned about your family and having a
> place to live?
>
> A.    Yeah.  And then my daughter had – was shot.  Then I had to put
> money over there to take care of that problem.  I had a lot of stress on

myself.  I even had a heart attack in the process of all of this.

Q.      Well, what I'm trying to understand is that if Ms. Farris-Ellison told you in October, based on your testimony, that she spent your money, well, wouldn't you be – you know, did you –

A.      I was concerned about it . . . but Flagstar said they would not deal [with] me.  They said they would not deal with me. Have the broker do it. And I said, "Okay" again.  I had to go back to her because she was the only body that could do it.

Q.      Yeah. But if you were told that she spent your money, then did you have any arrangement about getting it back from her if she –because it was your money.

A.      No.  She said – she just dealt with that when I had to deal with this issue first because Flagstar was putting us on the street, going to make us homeless, and I had no . . . no other choice.

Q.      But the thing is that, you know, if she spent your money and you were entitled to it, you're saying you –

A.      Let me explain. . . My family was on the street.  My house was tore up after the officers came through here to get him.  My house was tore up. My family was on the street.  I had to try to get my family safe.  I had a child shot.  I have a baby over here.  I had grandkids.  I had grandkids scarred up.  I have a lot of problems.  I was making a lot of mistakes at the time.  People was asking money from me and I was just shelling it out trying to fix the problem, trying to fix the problem.  The doctor's telling me she's going to die.  She's got a bullet in her head. . . And then I've got a baby just screaming and hollering from seeing her – seeing his mother's being shot and the police throwing me all in the street.  I had a lot of problems.  And people were asking me for money from everywhere and I was shelling money out, wasn't thinking at the time.  I thought she [Farris-Ellison] was going to take care of the problem.  She assured me that she would take care of that problem, give her what she needs, and that's what I did.

Trial Transcript, June 21, 2021, at 65-67 (Clark Testimony).

Clark's testimony is quoted at length here.  It indicates that he was asking for help from Farris-Ellison to deal with problems with the Flagstar refinancing loan that she originated rather than him asking to help her by making a loan to her.  With all of the personal problems facing Clark at the time, his version of the facts is more plausible, that is, he was having financial problems on his own and was not going out to offer

1  unsolicited loans as Farris-Ellison says.  The court recognizes that Clark has provided

2  scant evidence to show what his problem with Flagstar was at the time, but he does not

3  to have to provide corroborating evidence of the Flagstar problem to prove his claims

4  against Farris-Ellison.

5          Farris-Ellison's testimony about why Clark gave her this money was to make her

6  another loan: "I guess another loan or something he wanted to do, something else with

7  the funds."  Trial Transcript, June 21, 2021, at 247 (Farris-Ellison Testimony).  Asked

8  why Clark allegedly made Farris-Ellison another loan at this time, she answered: "I

9  guess to make up the difference of monies used during the course of that $48,000 that I

10  had in the escrow. . . "  *Id.*

11          Clark's Real Property Tax Reassessment Appeal

12          Farris-Ellison in her testimony denied that she ever assisted Clark on his real

13  property tax reassessment appeal before the County of Los Angeles.  Trial Transcript,

14  September 8, 2021, at 41-42, 114 (Farris-Ellison Testimony).  She testified that she was

15  not aware of any property tax problem that Clark had, that Clark never came to her

16  office to ask about helping him with a property tax issue and that she never received

17  any money from him to help him with a property tax issue. *Id.* at 103-104.   Farris-Ellison

18  denied that the first alleged loan made to her by Clark for $20,000 was to help him

19  negotiate with Los Angeles County about his property taxes.  Trial Transcript,

20  September 8, 2021, at 45 (Farris-Ellison Testimony).  Farris-Ellison did not recall that

21  after escrow had closed on Clark's refinancing loan that he went back to her office and

22  brought other money to her to solve his tax problem which resulted in a reassessment

23  of property taxes of $12,000 per year.  *Id.* at 103-104.

24          Clark testified that he requested Farris-Ellison to help him with his pending

25  property tax appeal as part of the refinancing loan transaction.  Trial Transcript,

26  September 8, 2021, at 222-224 (Clark Testimony).  However, Clark admitted that he

27  had no written agreement with Farris-Ellison to do this for him.  Trial Transcript,

28  December 2, 2021, at 62 (Clark Testimony). Clark has offered evidence that he had a

pending property tax appeal with the County of Los Angeles regarding a transfer of title

to his property between his mother and him in a claim for reassessment exclusion for

transfer between parent and child which excludes from reassessment of a principal

residence between parent and child signed by him and his mother, Vergie Clark, on

April 3, 2008 for a transfer to take place on April 30, 2008.  Plaintiff's Exhibit 27, Claim

for Reassessment Exclusion between Parent and Child.  An undated letter from the

County of Los Angeles indicated that the claim was approved and indicated that the

reassessment for the 2007-2008 tax year would be reversed.  Plaintiff's Exhibit 27,

Letter Approving Claim for Reassessment Exclusion.

Clark testified that Farris-Ellison was supposed to assist him with his property tax

problem dealing with the transfer of the property from his mother to him.  Trial

Transcript, September 8, 2021, at 226-227 (Clark Testimony). According to Clark, "And

the tax assessor says it's … his word was, 'It's a common mistake.'  But once we

reverse it, the bank's supposed to correct it, she's supposed to notify the bank and

everybody and clear it up.  She didn't do anything.  She's just like, 'I'm paid.  I'm done,

I'm done,' and not answer the phone."  *Id.*

Based on correspondence from the Los Angeles County Tax Assessor, the

reassessment issue was resolved in 2010 in that by letter sent in August 2010 the tax

assessor notified Clark that he might be entitled to a property tax refund for the 2008-

2010 time period and issued a property tax refund check to Clark for 2008 in the amount

of $6,665.28 in September 2010.  Plaintiff's Exhibit 23, Property Tax Correspondence.

The evidence substantiates that Clark was having to deal with a real property tax issue

arising from a family transfer of the residence from his mother to him, which apparently

triggered a reassessment of the assessment value of the property for property tax

purposes which resulted in a higher property tax assessment for tax years after the

transfer, but upon application, an intrafamily transfer can be excluded from a

reassessment, and thus, the evidence supports Clark's claim that he had a real property

tax problem that he asked Farris-Ellison as a real estate professional to help him on..

1

<u>Clark's Complaints to Flagstar Bank</u>

2          According to Clark, after his unsuccessful efforts to get the surplus refinancing

3   loan proceeds from Farris-Ellison, he decided to contact Flagstar Bank, the lender.  Trial

4   Testimony, September 8, 2021, at 180 (Clark Testimony); Plaintiff's Exhibit 12, Clark

5   Correspondence with Flagstar Bank about Money Not Received.  According to Clark, he

6   registered his complaint about not getting his surplus refinancing loan proceedings with

7   Flagstar Bank "right away", the lender, but according to Clark, the bank did not do

8   anything about his complaint until July 2009. *Id*.  Clark testified that he sent Flagstar

9   Bank a notice to cancellation of his loan because he did not get his surplus refinancing

10  loan proceeds.  Trial Testimony, June 21, 2021, at 35 (Clark Testimony).

11         Flagstar Bank attempted to contact Farris-Ellison for an explanation several

12  times unsuccessfully. Plaintiff's Exhibit 13, Flagstar Bank's August 2009

13  Communications; Trial Transcript, July 15, 2021, at 59-68 (Farris-Ellison Testimony). On

14  approximately September 10, 2009, Flagstar contacted Farris-Ellison about Clark's

15  refinancing loan (No. 52197213), requesting documents from her, including

16  disbursement checks.  Trial Transcript, July 15, 2021, at 50 (Farris-Ellison Testimony);

17  Trial Transcript, September 8, 2021, at 82 (Farris-Ellison Testimony).  Farris-Ellison did

18  not recall if she responded to Flagstar with a copy of all checks or how many times

19  Flagstar contacted her regarding a response.  *Id*.  Farris-Ellison thought that she did not

20  provide cancelled checks from escrow as requested by Flagstar.  Trial Transcript,

21  September 8, 2021, at 127, 145 (Farris-Ellison Testimony).

22         When Farris-Ellison finally responded to Flagstar's inquiry, her response was

23  why is it contacting her about the money.  Trial Transcript, September 8, 2021, at 127-

24  128, 131, 146 (Farris-Ellison Testimony).

25         During cross-examination, Farris-Ellison was asked whether she told Flagstar

26  when Flagstar's representative talked to her that Clark agreed to give her the money as

27  a loan, she answered that she did not know whether she had that conversation with

28  Flagstar.  Trial Transcript, July 15, 2021, at 105 (Farris-Ellison Testimony).  Clark asked

Farris-Ellison several times to clarify her answer, but she would not answer her question

directly. *Id*. at 105-106.  The court finds that Farris-Ellison did not tell Flagstar that Clark

lent her the money in response to its inquiry and request for copies of the disbursement

checks from the escrow on Clark's refinancing loan.

Farris-Ellison's Bankruptcy

Farris-Ellison filed for bankruptcy in 2011.  Trial Transcript, July 15, 2021, at 15-

16, 75 (Farris-Ellison Testimony).  She testified that she had to file a Chapter 7

bankruptcy case because she was "having a lot of financial issues at the time and

business had gotten really bad into the recession." *Id.*

Even though Farris-Ellison claims that Clark made the alleged loans to her

totaling $89,213.07 and acknowledges that she has not repaid these alleged loans to

Clark, she did not list him as a creditor on her original bankruptcy schedules filed on

June 1, 2011.  Bankruptcy Schedules, Bankruptcy Case No. 2:11-bk-33861-EC.  On

April 18, 2012, Farris-Ellison later amended her bankruptcy schedules to list Clark as a

creditor holding a disputed unsecured general claim.  Amended Bankruptcy Schedules,

Bankruptcy Case No. 2:11-bk-33861-RK.

Court's Findings re: Credibility of the Witness Testimony

The primary witnesses, the parties themselves, Clark and Farris-Ellison, gave

diametrically opposed testimony of the character of the transactions involving the

transactions involving Clark's $20,000 check dated August 12, 2008 to Farris-Ellison,

the uncashed $49,213.07 check of Lenders Escrow dated October 21, 2008 payable to

Clark never handed to him, and the funds represented by that check, and Clark's

$20,000 cashier's check dated January 2, 2009 payable to Lenders Escrow, Farris-

Ellison's escrow business.  The funds represented by these checks total $89, 213.07.

While the parties do not dispute that Farris-Ellison spent these funds and that all of

these funds were all spent.  The parties dispute that she was authorized to spend the

funds for her purposes.

The parties gave diametrically opposed testimony about the character of their

1  relationship.  While the parties do not dispute that they have known each other for a

2  long time since the late 1980s or early 1990s and had business relationship at least in

3  that Clark did construction repair work for Farris-Ellison on her properties and she

4  referred clients to him, they dispute that they were friends.

5        According to Clark, he gave Farris-Ellison the two checks of $20,000 each to

6  Farris-Ellison as part of the refinancing loan transaction that she was assisting him on

7  as his mortgage broker and escrow officer, that is, to help him solve problems with

8  getting the loan with Los Angeles County over property tax reassessment and with

9  Flagstar Bank, the lender, and that any use of the funds other than for these purposes

10  was not authorized by him.  As to the check for $49,213.07 in surplus refinancing loan

11  proceeds that were not given to him at the close of escrow, Clark testified that Farris-

12  Ellison never gave him the check and refused to give him these funds, and that any use

13  of the funds by Farris-Ellison for her purposes was not authorized by him.

14        According to Farris-Ellison, Clark offered all of these funds to her as loans to help

15  her keep her business open, which she accepted, and her use of the funds was thus

16  authorized.  She testified that Clark told her that he did not need the funds and since

17  they were friends and he knew that she was having financial problems, he made the

18  loans to her without any terms and conditions for repayment, such as setting an interest

19  rate or due dates of repayment.

20        Regarding the $49,213.07 due Clark in surplus refinancing loan proceeds at the

21  close of escrow, he testified that he was not present at the close of escrow at Farris-

22  Ellison's office on October 21, 2008 because he got into an altercation with the Los

23  Angeles Police Department during the home invasion incident at his house and was

24  taken into custody at that time.  Clark's testimony is that he could not be present at

25  Farris-Ellison's office at the closing of escrow because he was in police custody.  Farris-

26  Ellison testified that Clark met her at her office for the close of escrow and that her staff

27  had prepared the check for $49,213.07 and she was ready to hand the check to Clark,

28  but that he told her to keep it and use the funds because he wanted to keep her doors

open and that he did not need the money at that time.  Farris-Ellison testified that she

was aware of home invasion incident at Clark's house and that he was taken into

custody because she went over to his house to be with the family, but apparently, the

incident did not affect Clark's presence at her office for the close of escrow.

The diametrically opposite testimony of the parties cannot be reconciled.  The

parties' versions of the facts cannot be both true.

Having heard the testimony of the parties and considered the other evidence

received in this case, the court finds that Clark's testimony is generally credible and

closer to the truth and that Farris-Ellison's testimony is not generally credible and not as

close to the truth.

Clark is a construction contractor and a business person who was responsible for

his construction crew and his family.  The court found his testimony credible that he had

to hustle for jobs.  It is not likely that he had copious time to spend with Farris-Ellison at

her office "daily and weekly" and bring and have lunch with her and her staff for 19

years as she testified at trial.  The court believes Clark when he testified that he was too

busy in the field to have spend time with Farris-Ellison at her office.  As Farris-Ellison

admitted, she and Clark are not relatives.  It is not likely that Farris-Ellison and Clark

spent time together not only at her office for lunch on a "daily or weekly" basis, but

socialized together.  Farris-Ellison testified that Clark brought her wine regularly and

they went on trips together, including wineries, and that they even went to Las Vegas

together, just the two of them, driving up there, and immediately driving back on a

"turnaround" trip.  Having observed the demeanor of the parties during their testimony,

the court find Farris-Ellison's testimony about their relationship being close as simply

not plausible.  Farris-Ellison's exaggeration of her relationship with Clark casts doubt on

her testimony about the transactions involving Clark's money.

Clark testified that his relationship with Farris-Ellison was a business one that he

did construction repair work for her on her properties and that she referred him work,

and based on this relationship, he contacted her about helping him get a refinancing

loan on his house.  Clark contacted her about getting a loan in early 2008, and in

summer 2008, she assisted him on his loan application which she submitted to Flagstar

Bank as the lender.  Clark testified that she helped him with issues that came up during

the refinancing, that is, there was a real property tax reassessment on his house, and

that he asked her to help him with it.

        The court admits that it is difficult to reconcile the evidence with Clark's claims

that Farris-Ellison withheld his loan money without his consent and that she refused his

demands for payment in late 2008 when he and Sims went to confront her in the

parking lot outside her office based on evidence that he later made a voluntary payment

of $20,000 to her escrow company in January 2009 and that she offered evidence that

Clark and his relatives received payments from her of the loan proceeds after he

confronted her about not getting his loan proceeds in November 2008.  Clark's

explanation that he needed to finish the construction work that he was doing for Farris-

Ellison in order for him to sue her if she did not pay him is plausible, but his testimony

that he did not know that she was using his money to pay him for his work rather than

her money is also plausible.  Clark's testimony on this point is more plausible and

credible than Farris-Ellison's testimony that he just gave her large loans because they

were close friends and he did not need the money.

        Farris-Ellison's testimony is that Clark never asked her for the rest of the loan

proceeds until a year after escrow closed when he made a complaint to Flagstar Bank

about not getting them and that she made the payments to Clark or his relatives based

on their arrangement that she could use the loan proceeds as she needed but she

would disburse funds from the loan proceeds when he requested.

        Farris-Ellison's testimony that Clark made loans totaling $89,213.07 without any

repayment terms does not make economic sense.  Clark had approached her earlier in

2008 about helping him get a home refinancing loan, which resulted later that year in his

applying for a loan with Flagstar Bank with her help as the mortgage broker.  Clark's

testimony is that he wanted a "cash out" loan to take out some equity in his house for an

investment in real property in Culver City or for home improvements makes economic sense.  Farris-Ellison's testimony that Clark just wanted a new loan to pay off a short term hard money loan on his house and that the amount of surplus loan proceeds was not an important consideration for Clark because the amount available to take out was small does not make economic sense.  While it is probably true that Clark wanted to pay off an existing loan, which may have been a hard money loan (though there was really no evidence about that particular loan before the court), Farris-Ellison's testimony acknowledging that Clark wanted to pay off a hard money loan indicates that Clark had a problem obtaining a more favorable conventional loan with lower interest than a hard money loan and that he have substantial funds to lend to others.  Farris-Ellison's testimony that the amount he and Clark expected a small "cash out" from a loan is not substantiated because the amount of surplus refinancing loan proceeds due Clark was over $50,000 because these funds represent a substantial cash out.  The court finds Farris-Ellison's testimony that Clark went to all of the trouble to apply for a refinancing loan and then simply gave the surplus loan proceeds of about $50,000 to her because they were such good friends not to be credible.

Having observed the demeanor of Clark and Farris-Ellison over four days of trial, the court finds that it is unlikely Clark lent Farris-Ellison substantial sums totaling $89,213.07, which put himself at great financial risk in lending these sums to a borrower in serious financial trouble without any terms and conditions of repayment, such as provision of interest at a market rate or a due date of repayment.  The lack of any written documentation for these alleged loans supports Clark's testimony that he made no such loans and that Farris-Ellison's testimony that there were such loans lacks credibility.

Farris-Ellison's explanation from her testimony is that because they had a close friendship where he visited her office for "daily and weekly" and brought her and her staff lunch for 19 years.  The court could understand an interest free, no term and condition family loan in this situation if Clark and Farris-Ellison were family, but

admittedly they are not family.  The court finds that Farris-Ellison's testimony that she and Clark had a close non-business relationship akin to family to warrant an interest free loan with no terms and conditions other than an unstated expectation of repayment someday is not credible.

There is other evidence in support of Clark's claims.  The escrow closing statement, the HUD-1, only shows funds due borrower at the close of escrow, that is, to Clark, in the amount of $50,845.07.  The HUD-1 does not show that these funds are disbursed instead to the escrow's principal, Farris-Ellison.  Clark argues that the alleged loan to Farris-Ellison never happened because it is not reflected on the HUD-1, and is thus procedurally irregular.  Farris-Ellison's response is that the loan is not reflected on the HUD-1 because she and Clark had a separate oral agreement that he would not take the funds due borrower at the close of escrow and that he was loaning these funds to her for her use.  That is, her testimony was that she was ready to hand him the check for the surplus refinancing loan proceeds, but he told her to hold on to it and keep it as a loan.  The court agrees with Clark that the HUD-1 supports his testimony because if Farris-Ellison's testimony is correct that the escrow did not close in conformance with the HUD-1, the escrow closing statement.  For the transaction to conform to the HUD-1 and provide for a loan to Farris-Ellison, she needed to hand Clark the check, showing that the funds due borrower were indeed paid to the borrower, and he should have indicated that the check would be payable to Farris-Ellison by endorsing it to her as indication that he was making a loan to her.  The nonconformance of the transaction to the HUD-1 supports an inference that the transaction did not occur as Farris-Ellison testified.

Moreover, the transaction was procedurally irregular as Clark contends because the funds put into escrow by Flagstar Bank as a loan and due Clark as borrower were deposited into Lenders Escrow's single bank account and not into a separate trust account to hold funds for clients of a real estate agent performing broker escrow services like Farris-Ellison, which the California Department of Real Estate determined

to violate California law under California Business and Professions Code § 10176(e).

Plaintiff's Exhibit 14, Decision of California Department of Real Estate, filed August 29, 2012.  After escrow closed, the funds remained Clark's funds purportedly lent to Farris-Ellison as she testified that she was holding onto the funds for Clark, which she could draw upon for her purposes as he allegedly authorized or she could pay out at his direction.  Farris-Ellison's continuing deposit of Clark's funds in a nontrust account was a knowing and continuing violation of California Business and Professions Code § 10176(e).

The evidence relating to Clark's complaint to Flagstar Bank about not getting all of his surplus refinancing loan proceeds from escrow in 2009 also supports his version of the facts.  Clark made his complaint that he did not get all of his surplus refinancing loan proceeds from escrow, and Flagstar Bank in response investigated his complaint and attempted to contact Farris-Ellison as the escrow's principal.  Flagstar had difficulty in getting Farris-Ellison to respond to its inquiry.  Farris-Ellison's response to Flagstar about its inquiry was asking why it was asking her about the transaction.  Flagstar requested copies of the disbursement checks issued in the escrow.  There is no evidence that Farris-Ellison produced the disbursement checks to Flagstar.  There is also no evidence that Farris-Ellison explained to Flagstar that the funds were disbursed to her because Clark made a loan of the funds to her.  The evidence regarding the Flagstar inquiry suggests a lack of cooperation by Farris-Ellison and a failure to tell Flagstar that Clark made a loan to her supports Clark's version of the facts that there was no loan.

Clark offered the testimony of the third and only other witness, Melvin Sims, to corroborate his meeting with Farris-Ellison in November 2008 to demand payment of the surplus refinancing loan proceeds.  The court discounts Sims's testimony somewhat because Sims is a friend and former worker for Clark and his testimony was a little vague on specifics.  The court does find his testimony credible that he went with Clark to meet with Farris-Ellison because Clark told him that he could not pay his workers on

time like Sims as he did not get all of his money from the refinancing loan held by

Farris-Ellison, so he had a reason to go with Clark to Farris-Ellison's office.  Sims's

testimony corroborates Clark's version of the facts that he sought out Farris-Ellison to

demand payment of his refinancing loan proceeds which was due him from escrow in

November 2008.  That is, Clark was asking for the rest of his refinancing loan proceeds

due borrower at the close of escrow as shown on the HUD-1, not asking Farris-Ellison

to repay the loans that he allegedly made her.  Farris-Ellison's version of the facts is

that this meeting in November 2008 never happened because Clark never asked to be

repaid until a year later when he complained to Flagstar Bank.  (However, the court

does not find credible Sims's testimony that when Farris-Ellison told him and Clark that

she spent the money, she told them there was "nothing" that they could do about it.).

Regarding the evidence offered by Farris-Ellison that Clark made her a loan of

the total amount of $89,213.07 that she repaid the loan by making the payments to

Clark or his relatives based on their arrangement that she could use the loan proceeds

as she needed but she would disburse funds from the loan proceeds when he

requested.  The court finds that the evidence does not negate Clark's showing based on

his testimony that he did not intend to make Farris-Ellison loans of these funds.  First,

Farris-Ellison in her testimony stated that Clark offered her open-ended loans with no

terms or conditions of repayment.  At the time of the loans, according to her, he just

offered her the loans, but they never discussed repayment, such as the arrangement for

her to hold the funds in her escrow company's account and to make repayment upon

his demand.  She did not testify that they had any discussion of this kind of

arrangement.

Farris-Ellison's assertion that these payments were repayments of her loans from

Clark is really in the nature of an affirmative defense for which she has the burden of

proof.  Clark explained that the payments to him were for work performed on projects.

The payments to Clerk are consistent with the type of payments that he received as a

contractor is that he received payment for labor for work performed on construction

projects and that his clients paid for materials for projects to the suppliers.  For example, Farris-Ellison wrote out three checks payable to Clark dated February 9, 2009 in the amounts of $125.00, $100.00 and $500.00.  These checks are consistent with Clark asking for payment for work on three projects, and if he was just asking for payment for himself, it seems that he would have just asked for payment in one check.  Clark's testimony that he did not realize that he was being paid for construction work with his own money was credible.  The court recognizes that Clark did not offer written evidence showing that he was performing construction work for Farris-Ellison on her property, but his testimony that their agreements for him to work on her property was oral only is credible.

Clark had testified that a number of the people to whom checks were written to, such as Charles Ellis, Patricia Morton or Mike Jones, or for whom a credit card charge was made, Luanitra Clemmons, he did not know.  Farris-Ellison did not offer evidence to show who these people she made payments to or for were, so the court finds that payments for these persons are not attributable to Clark. Regarding the $1,800.00 check that Farris-Ellison wrote out to Odell Farris, her sister-in-law, Farris-Ellison did not call Odell Farris as a witness at trial or otherwise corroborate her story that Clark instructed her to write the check because he was making a loan to Odell Farris.  Clark had testified that several checks were to suppliers of materials for projects on Farris-Ellison's property, Legacy Garage Doors and Delco Disposal.  His testimony is consistent with his business practice of requiring his clients to pay for materials on their projects themselves.  Farris-Ellison did not offer evidence to show who these people that she paid were, so the court finds that payments for these persons are not attributable to Clark.  Accordingly, the court finds that Farris-Ellison's testimony on this point not to be credible.

Regarding the payments to or on behalf of Virgie Clark and Royce Moore, Clark's mother and his daughter, the court finds that Clark's testimony that he did not know of these payments to be credible.  The court closely observed Clark's demeanor when he

gave testimony about these payments, and the court found that his demeanor and responses were consistent with someone who did not know of a certain event or transaction. Farris-Ellison did not call any witnesses to testify in support of her defense that Clark was the person who directed her to make these payments, such as the recipients themselves. The amounts purportedly paid to or for Virgie Clark and Royce Moore are relatively small, a total of $4,108.07 based on a check for $2,000.00, a check for $1,000.00, a credit card charge for $608.50 and a check for $500.00, that is, small in comparison to the total amount of the surplus refinancing loan proceeds of $49,213.07 that Farris-Ellison took and spent. The comparative small amounts allegedly paid to these parties and the lack of corroborating testimony leads the court to find that Farris-Ellison's testimony that Clark directed her to pay these parties not to be credible. Regarding the $49,213.07 in surplus refinancing loan proceeds due Clark as borrower held in the Lenders Escrow account controlled by Farris-Ellison, she did not keep running totals of the alleged loan, such as the amounts she withdrew for her purposes, the amounts that she disbursed to Clark or on his behalf as repayment or the amounts that she was still holding for him until she prepared the DRE ledger in defense of Clark's complaint before the Department of Real Estate in 2012. Clark's surplus refinancing loan proceeds that she allegedly borrowed in October 2008 were all spent by February 2009 as shown by her DRE ledger.

As to the alleged loans totaling $40,000 based on the two $20,000 checks that Clark gave Farris-Ellison, she provided no evidence of an accounting at any time of the funds that she withdrew and spent, that she spent on behalf of Clark or that she was holding on for him. The money was all spent for her purposes. Farris-Ellison has not asserted that she and Clark had the same arrangement for these funds as they had for the surplus refinancing proceeds that she was authorized to use the funds as needed, that she would pay Clark from these funds as he directed and that she would hold onto the funds otherwise. She offered no testimony to this effect. She only prepared an after the fact accounting of the surplus refinancing loan proceeds because they were the

subject of the DRE complaint as these other funds were not.  Farris-Ellison's explanation of the alleged January 2009 loan that she guessed that Clark wanted to "make up" for the amounts that he was paid from his surplus refinancing loan proceeds is nonsensical and inconsistent with her other testimony that those payments were repayments of his loan from the surplus refinancing loan proceeds.

Accordingly, the court finds that Clark did not loan the subject funds to Farris-Ellison, that he expected to receive the cash out funds from his refinancing loan in the amount of $49,213.07, that he paid $40,000 to Farris-Ellison to resolve problems in his refinancing transaction, including real property tax reassessment, and that she took his money and used it for her personal purposes without his knowledge or consent.

In Clark's state court action to recover funds from Farris-Ellison, the Superior Court of California entered a default judgment against Farris-Ellison in the amount of $100,000 on or about December 30, 2013.  Plaintiff's Exhibit 10, State Court Judgment. The court does not see how the Superior Court determined the amount of $100,000. During the trial, the court discussed with the parties the issue raised by Farris-Ellison about the basis of the $100,000 amount.  Trial Transcript, June 17, 2021, at 33-35 (colloquy between court, counsel and Clark); Trial Transcript, December 2, 2021, at 65-72 (Clark Testimony).  While the Superior Court determined a debt owed by Farris-Ellison to Clark in the amount of $100,000, the court in this debt dischargeability action has to determine how much of that $100,000 debt is nondischargeable under Clark's claims under 11 U.S.C. § 523(a).

The only evidence that Clark showed the amounts that Farris-Ellison took from him were: (1) $20,000 in Clark's personal check payable to Farris-Ellison dated August 12, 2008; (2) $49,213.07 in the prepared escrow check dated October 21, 2008 representing the balance of the surplus refinancing loan proceeds due Clark; and (3) $20,000 in Clark's cashier's check payable to Lenders Escrow, Farris-Ellison's business, dated January 2, 2009.  These amounts total $89,213.07.  Trial Transcript, December 2, 2021, at 53 (Clark Testimony)..  Clark has not offered evidence to prove

that the amount of his loss is higher than $89,213.07.  Clark testified that he was

"missing one more check . . . [of] another $20,000 to straighten the problem out."  Trial

Transcript, June 21, 2021, at 62 (Clark Testimony).  However, Clark never produced at

trial the missing third $20,000 check or other evidence showing that he gave Farris-

Ellison more than $89,213.07.  This is consistent with Clark's state court judgment

which only refers to evidence of only the two checks of August 12, 2008 and January 2,

2009 and no others.  Plaintiff's Exhibit 10, State Court Judgment.  Accordingly, the court

finds that the principal amount of Farris-Ellison's debt to Clark that is nondischargeable

is $89,213.07.  However, the court notes that Clark is entitled to postjudgment interest

at the California statutory postjudgment interest rate of 10% per year pursuant to

California Code of Civil Procedure § 685.010(a).   However, the court does not

determine the amount of interest on the judgment, but only determines that the debt

from the state court judgment in the amount of $89,213.07, plus statutory interest, is

nondischargeable.

## ANALYSIS

In this adversary proceeding, Clark seeks a determination of its claims that the

debts owed by Farris-Ellison to him are nondischargeable pursuant to 11 U.S.C. § 523.

This statute contains provisions for excepting debts owed by a debtor to a creditor from

discharge. Clark asserts specifically that the debts owed to him by Farris-Ellison should

be excepted from discharge pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4) and (a)(6).

"Creditors seeking a nondischargeability determination must first establish an

*enforceable claim* under state law (whether or not the claim has been filed in the

bankruptcy proceeding)."  March, Ahart and Shapiro, *Rutter Group California Practice

Guide: Bankruptcy*, ¶ 22-1641 (online edition, December 2021 update) (emphasis in

original), *citing, In re Dobos*, 603 B.R. 31, 38-39 (9th Cir. BAP 2019) ("the existence of a

valid claim is a precondition to any action under § 523," dismissing nondischargeability

complaint where creditors' state-court judgment had expired and was thus no longer

enforceable).  This is so because the statutory language of 11 U.S.C. § 523 does not

provide for the creation of debts, but rather for determination of such existing debts as nondischargable under certain conditions. *Del Bino v. Bailey* (*In re Bailey*), 197 F.3d 997, 1001 (9th Cir. 1999) (bankruptcy law governs whether a claim is nondischargeable pursuant to 11 U.S.C. § 523, state law determines whether the creditor has a claim against debtor, such as for the tort of conversion).

Clark contends that Farris-Ellison owes him a debt of $100,000,   Clark's Closing Brief, Docket No. 615 at 16-17.  In granting Clark partial summary adjudication of facts, the court has determined that Clark has shown that the amount of the debt owed by Farris-Ellison has been determined and liquidated in another legal action, and thus, to determine his claims for nondischargeability of debt, the court does not have to determine whether there are underlying debts owed by Farris-Ellison to him under state law.  However, in this adversary proceeding, the court must determine the extent to which the debt is nondischargeable.

Clark's third amended complaint alleges claims under the Bankruptcy Code, 11 U.S.C., for determination of dischargeability of debt.  In his first cause of action under 11 U.S.C. § 523(a)(4), Clark alleges that the debt owed by Farris-Ellison is nondischargeable because it is for money and property that were obtained through fraudulent breach of fiduciary duty or embezzlement.  Third Amended Complaint, Docket No. 271 at 8-9 (internal page citation at 3-4).  In his second cause of action under 11 U.S.C. § 523(a)(6), Clark alleges that the debt owed by Farris-Ellison to him is for a willful and malicious injury.  Third Amended Complaint, Docket No. 271 at 9-10 (internal page citation at 4-5). In his third cause of action under 11 U.S.C. § 523(a)(2), Clark alleges that the debt owed by Farris-Ellison is nondischargeable because it is for money and property that were obtained through fraud.  Third Amended Complaint, Docket No. 271 at 10-11 (internal page citation at 5-6).  The substantive basis under state law for the claims under 11 U.S.C. § 523(a)(6) is conversion and fraud. Conversion and fraud are not alleged by Clark in separate claims under state law, but as the basis for his claims for relief under 11 U.S.C. § 523(a).

1    Claims under 11 U.S.C. § 523(a) are proven by a preponderance of the

2  evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

3    A.    Clark's Claim under 11 U.S.C. § 523(a)(4).

4    In his third amended complaint, Clark asserts a claim for nondischargeability of

5  debt under 11 U.S.C. § 523(a)(4) which provides in pertinent part that "[a] discharge

6  under section 727 ... of this title does not discharge an individual debtor from any debt

7  ... (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or

8  larceny."  In his third amended complaint, Clark alleges that Farris-Ellison "fraudulently

9  converted" his escrowed monies.

10    "Embezzlement is the fraudulent appropriation of property by one to whom it is

11  entrusted or into whose hands it has lawfully come."  *Moore v. United States,* 160 U.S.

12  268, 269-270 (1895).  The elements of a claim of embezzlement under 11 U.S.C. §

13  523(a)(4) are: (1) property rightfully in the possession of a nonowner; (2) the

14  nonowner's appropriation of the property to use other than which it was entrusted; and

15  (3) circumstances indicating fraud.  *In re Littleton,* 942 F.2d 551, 555 (9th Cir. 1991).

16  The elements of embezzlement under 11 U.S.C. § 523(a)(4) are met here.  The

17  preponderance of the evidence establishes the first element of property rightfully in the

18  possession of a nonowner.  Clark's funds totaling $89,213.07, were rightfully in the

19  possession of Farris-Ellison, a nonowner, as Clark gave her the two checks of $20,000

20  each for use in his refinancing transaction, and Farris-Ellison was holding onto Clark's

21  surplus refinancing proceeds as the escrow.  The preponderance of the evidence

22  establishes the second element of the nonowner's appropriation of the property to use

23  other than which it was entrusted.  Farris-Ellison used all of Clark's funds totaling

24  $89,213.07 for her personal purposes or other purposes that he did not know about or

25  authorize.  Clark entrusted the $40,000 he gave her in the two $20,000 checks to fix the

26  problems that he was having in his refinancing loan transaction, and not as loans to her

27  as she claimed in this lawsuit.  As to these funds, Farris-Ellison spent them for her

28  personal purposes.  Clark's surplus refinancing loan proceeds of $49,213.07 were

1  entrusted to Farris-Ellison in the escrow opened for his refinancing loan transaction.

2  The funds were deposited in escrow by Clark's lender, Flagstar Bank, for disbursement

3  due to Clark as borrower as shown on the escrow closing statement, the HUD-1.  Clark

4  did not give his permission to hold onto these funds after the close of escrow or to

5  spend them.  The preponderance of the evidence establishes the third element of

6  circumstances indicating fraud.  Farris-Ellison was holding onto Clark's funds for

7  specific purposes authorized by him relating to his refinancing loan transaction, but she

8  spent his funds for her personal purposes or other purposes not authorized by him.  She

9  was in financial trouble and spent Clark's money without his knowledge or consent.

10  She made no accounting of Clark's money as she was spending it, and she made no

11  repayments of Clark's money, even using his money to pay for construction work that

12  he did for her.  These circumstances indicate fraud.

13        Alternatively, Farris-Ellison's debt to Clark is nondischargeable as a defalcation

14  in a fiduciary capacity.  "Defalcation" is generally defined as the misappropriation of trust

15  funds or money held in any fiduciary capacity. March, Ahart and Shapiro, *Rutter Group*

16  *California Practice Guide: Bankruptcy*, ¶ 26:632 (online edition, December 2021

17  update), *citing, In re Lewis*, 97 F.3d 1182, 1186-1187 (9th Cir. 1996).  The Ninth Circuit

18  Bankruptcy Appellate Panel has stated that there are three bases for determining that a

19  fiduciary's defalcation supports an exception to discharge: (1) acts of bad faith, moral

20  turpitude or other immoral conduct; (2) intentional improper conduct and criminally

21  reckless conduct; and (3) conscious disregard of—or willful blindness to—a substantial

22  and unjustifiable risk (a heightened "recklessness" standard).  Id., ¶632.1, *citing, In re*

23  *Heers*, 529 B.R. 734, 742-743 (9th Cir. BAP 2015).  Here, Farris-Ellison's

24  misappropriation of Clark's funds that he gave her to be deposited into the escrow for

25  his refinancing loan transaction were to be held in a separate trust account as required

26  by California law, and are thus considered trust funds, and she spent these funds for

27  her personal purposes or other purposes not authorized by Clark, knowing that she was

28  having financial difficulties and without the ability to repay Clark the funds she spent.

This misconduct amounts to defalcation for purposes of 11 U.S.C. § 523(a)(4).

Accordingly, the court finds that Clark has established his claim against Farris-Ellison

under 11 U.S.C. § 523(a)(4) by a preponderance of the evidence.  As indicated above,

the debt owed by Farris-Ellison to Clark which is nondischargeable is $89,213.07, plus

statutory interest from the date of entry of judgment by the state court.

B.    Clark's Claim under 11 U.S.C. § 523(a)(6)

In his third amended complaint, Clark alleges that the debts owed by Farris-

Ellison to him are nondischargeable pursuant to 11 U.S.C. § 523(a)(6), which provides

that debts incurred as the result of willful and malicious injury are not dischargeable. 11

U.S.C. § 523(a)(6).  In his third amended complaint, Clark alleges that Farris-Ellison

"willfully and maliciously converted" his escrowed monies.

As stated by the Ninth Circuit in *Lockerby v. Sierra*, 535 F.3d 1038, 1040,

"tortious conduct is a required element for a finding of nondischargeability under §

523(a)(6)."  While federal bankruptcy law governs whether a claim is excepted from

discharge under 11 U.S.C. § 523(a)(6), the federal courts look to state law to determine

whether an act falls within the underlying tort.  *In re Bailey*, 197 F.3d 997, 1000 (9th Cir.

1999).

Regarding a claim under 11 U.S.C. § 523(a)(6), the Ninth Circuit has stated, "The

Supreme Court in *Kawaauhau v. Geiger* (*In re Geiger*), 523 U.S. 57, 118 S.Ct. 974, 140

L. Ed. 2d 90 (1998), made clear that for section 523(a)(6) to apply, the actor must intend

the consequences of the act, not simply the act itself."  *Ormsby v. First American Title

Co. of Nevada* (*In re Ormsby*), 591 F.3d 1199, 1206 (9th Cir. 2010).  Both willfulness

and maliciousness must be proven to prevent discharge of the debt.  *Id*.  But reckless or

negligent acts are not sufficient to establish that a resulting injury falls within the

category of willful and malicious injuries under § 523(a)(6).  *Kawaauhau v. Geiger*, 523

U.S. at 64.

Willfulness means intent to cause injury.  *Kawaauhau v. Geiger*, 523 U.S. at 61.

"The injury must be deliberate or intentional, 'not merely a deliberate or intentional act

that leads to injury.'" *In re Plyam*, 530 B.R. 456, 463 (9th Cir. BAP 2015) (quoting

*Kawaauhau v. Geiger*, 523 U.S. at 61) (emphasis in original).  The court may consider

circumstantial evidence that may establish what the debtor actually knew when

conducting the injury creating action and not just what the debtor admitted to knowing.

*In re Ormsby*, 591 F.3d at 1206 (citation omitted).  Recklessly inflicted injuries, covering

injuries from all degrees of recklessness, do not meet the willfulness requirement of §

523(a)(6).  *In re Plyam*, 530 B.R. at 464.  Reckless conduct requires an intent to act

instead of an intent to cause injury.  *Id*.  Therefore, the willful injury requirement "… is

met when the debtor has a subjective motive to inflict injury or when the debtor believes

that injury is substantially certain to result from his own conduct."  *Carillo v. Su* (*In re*

*Su*), 290 F.3d 1140, 1142 (9th Cir. 2002) (citation omitted).

A malicious injury is one that involves; "(1) a wrongful act, (2) done intentionally,

(3) which necessarily causes injury, and (4) is done without just cause or excuse."

*Petralia v. Jercich* (*In re Jercich*), 238 F.3d 1202, 1209 (9th Cir. 2001). In *Jercich*, the

court found that the debtor's withholding of wages to his employee, despite his ability to

pay the employee, and use of the wage money for his own personal benefit without any

just cause or excuse for withholding the wages, was substantially certain to cause injury

to the employee and therefore fulfilled the malicious prong of § 523(a)(6). *Id*.  "Malice

may be inferred based on the nature of the wrongful act", but to make such an

inference, willfulness must be established first.  *In re Ormsby*, 591 F.3d 1199 at 1207.

In this case, Clark argues that the underlying tort for his claim under 11 U.S.C. §

523(a)(6) is conversion.  Since the parties involved in this adversary proceeding are

located in California and the events at issue took place in California, the court applies

California law to determine the underlying tort of conversion for Swing House's claim

under 11 U.S.C. § 523(a)(6).  As stated by the California Supreme Court in *Lee v.*

*Hanley*, 61 Cal.4th 1225 (2015),

> Conversion is the wrongful exercise of dominion over property of another.  The
> elements of a conversion claim are: (1) the plaintiff's ownership or right to
> possession of the property; (2) the defendant's conversion by a wrongful act or

disposition or property rights; (3) damages. . . .

*Id*. at 1240 (citations and internal quotation marks omitted).  The evidence supports a finding of conversion of Clark's funds by Farris-Ellison spending these funds for her personal purposes or other purposes not authorized by him.

The elements of conversion are satisfied by a preponderance of the evidence. First, the evidence shows that Clark's ownership of the property or right to possession of the property, that is, Clark owns the $40,000 in funds that he entrusted Farris-Ellison for using in his refinancing loan transaction, and Clark had a right to possession or owed the surplus refinancing loan proceeds in the amount of $49,213.07, which were due him as loan borrower at the close of escrow.  Second, the evidence shows that Farris-Ellison converted Clark's funds by a wrongful act or disposition because she dissipated his funds for her personal purposes or other purposes not authorized by him without his knowledge or consent.  Second, the evidence shows Clark's damages in the amount of $89,213.07 in funds which Farris-Ellison dissipated without his knowledge or consent.

The willful injury requirement of 11 U.S.C. § 523(a)(6) is met here because the circumstances indicate that Farris-Ellison had a subjective motive to inflict injury or when she believed that injury is substantially certain to result from her own conduct. The evidence shows this in that Farris-Ellison knew that she was using Clark's funds for her personal purposes or other purposes not authorized by him rather than for the purposes that he entrusted her with the funds and that she was having financial difficulties indicating that she lacked ability to repay Clark the funds she used.

The malicious injury requirement of 11 U.S.C. § 523(a)(6) is met here because Farris-Ellison's conversion of Clark's funds was a wrongful act, which she did intentionally as she knew she was dissipating his funds without his knowledge or consent, which necessarily caused Clark injury as she was having financial difficulties and did not have the ability to repay Clark and she converted Clark's funds without just cause or excuse because Clark did not lend her the funds or otherwise authorize her to

use his funds in a way other than he instructed her, that is, to facilitate his refinancing loan transaction.

Accordingly, the court finds that Clark has established his claim against Farris-Ellison under 11 U.S.C. § 523(a)(4) by a preponderance of the evidence.  As indicated above, the debt owed by Farris-Ellison to Clark which is nondischargeable is $89,213.07, plus statutory interest from the date of entry of judgment by the state court.

C.    Clark's Claim under 11 U.S.C. § 523(a)(2)(A)

In his third amended complaint, Clark asserts a claim for nondischargeability of debt under 11 U.S.C. § 523(a)(2)(A) which provides in pertinent part that "[a] discharge under section 727 ... of this title does not discharge an individual debtor from any debt ... (2) for money, property, services ... to the extent obtained by ... (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."  In his third amended complaint, Clark alleges that Farris-Ellison "fraudulently converted" his escrowed monies.

The elements of a claim under 11 U.S.C. § 523(a)(2)(A) are: (1) the debtor made representations; (2) that at the time the debtor knew they were false; (3) the debtor made those representations with the intention and purpose of deceiving the creditor; (4) the creditor justifiably relied on these representations; and (5) the creditor sustained losses as a proximate result of the debtor's representations. *Ghomeshi v. Sabban* (*In re Sabban*), 600 F.3d 1219, 1222 (9th Cir. 2010); *In re Slyman*, 234 F.3d 1081, 1085 (9th Cir. 2000).  The court finds that it is difficult to pinpoint specific representations by Farris-Ellison made that constitutes express misrepresentations under 11 U.S.C. § 523(a)(2)(A).  Clark has not identified specific statements made by Farris-Ellison to have induced him to give her money as alleged to constitute express misrepresentations.  His testimony is that he gave her money for specific uses relating to his refinancing transaction, but she diverted the money for her personal or other unauthorized purposes.

Clark's fraud allegations against Farris-Ellison appear to fall under the category

of promissory fraud, which is a recognized tort under California law." *Engalla v.*

*Permanente Medical Group,* 15 Cal.4th 951, 973-974 (1997).  The California Supreme

Court has stated:

> "Promissory fraud" is a subspecies of fraud and deceit.  A promise to do something implies the intention to perform; hence, where a promise implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud.  An action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract. "(*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638 [49 Cal.Rptr.2d 377, 909 P.2d 981].).  The elements of fraud that will give rise to a tort action for deceit are: "'(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.'"

*Engalla v. Permanente Medical Group,* 15 Cal.4th at 973-974.  This definition fits the

evidence in this case as Clark gave his money in the two $20,000 checks to Farris-

Ellison for the specific purpose of addressing his property tax issues related to the

refinancing transaction that she was assisting him on as mortgage broker and escrow

agent, and as escrow agent, she was holding the surplus refinancing loan proceeds of

$49,213.07 due him as borrower.  The evidence does not support Farris-Ellison's

defense that Clark was lending her these funds; rather, Clark instructed her to use the

two $20,000 checks to address his property tax problem, and Clark in taking out the

refinancing loan with her assistance as broker and escrow was expected to receive the

surplus refinancing loan proceeds.  The evidence indicates that Clark discussed with

Farris-Ellison what he wanted to give her the money for and that she took his funds for

herself, never disclosing that she was not going to use them for the purposes, which

indicates an implied misrepresentation of fact in her failure to disclose her actual intent

to use his funds for her purposes because she was in financial difficulty and needed

money to pay her bills.  Clark justifiably relied on Farris-Ellison's implied

misrepresentations of fact as she was given or holding onto his money as a licensed

mortgage broker and real estate agent to his detriment in her dissipating his funds

totaling $89,213.07.  Accordingly, the court determines that Clark is also entitled to relief on his claim under 11 U.S.C. § 523(a)(2)(A) because Farris-Ellison obtained money from Clark by false misrepresentation.

**D.  Clark's Motions to Compel Discovery and for Sanctions**

The court has reviewed Clark's motions to compel discovery and for sanctions, and Farris-Ellison's responses thereto.  In a separate order, the court addresses these motions and determines that the motions should not be granted because Clark's discovery requests, including requests for admission, interrogatories and document production requests were voluminous and burdensome and disproportionate to the needs of this case and Farris-Ellison gave appropriate and responses to Clark's discovery requests and produced meaningful discovery in response to his discovery requests adequate to the needs of the case.  Accordingly, the court determined that the case should be decided on the merits, and it has.

**E.  Adversary Proceeding No. 2:14-ap-01088-RK**

Clark's complaint in Adversary Proceeding No. 2:14-ap-01088-RK raises the same claims as his third amended complaint in Adversary Proceeding No. 2:12-ap-01830-RK.  Since the court will be entering judgment in Clark's favor in Adversary Proceeding No. 2:12-ap-01830-RK, any judgment on the same claims in No. 2:14-ap-01088-RK would be duplicative, and it would be improper to award Clark two judgments on the same claims.  Accordingly, the court in its judgment after trial will dismiss Adversary Proceeding No. 2:14-ap-01088 as duplicative.

*///*

*///*

*///*

1     A separate judgment consistent with these findings of fact and conclusions of law

2  is being filed and entered concurrently herewith.

3     IT IS SO ORDERED.

4                              ###

Date: September 28, 2022

_____

Robert Kwan
United States Bankruptcy Judge